*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@appellate.courts.state.ak.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

|  |  |  |
|---|---|---|
| MICHAEL S. REILLY, | ) | |
| | ) | Supreme Court No. S-14642 |
| Appellant, | ) | |
| | ) | Superior Court No. 3AN-03-08806 CI |
| v. | ) | |
| | ) | O P I N I O N |
| JAIME M. NORTHROP and | ) | |
| STATE OF ALASKA, | ) | No. 6859 – December 20, 2013 |
| DEPARTMENT OF REVENUE, | ) | |
| CHILD SUPPORT SERVICES | ) | |
| DIVISION, | ) | |
| | ) | |
| Appellees. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Mark Rindner, Judge.

Appearances: Michael S. Reilly, pro se, Butte, Montana, Appellant. Jaime M. Northrop, pro se, Wasilla, Appellee. Glenn M. Gustafson, Assistant Attorney General, Anchorage, and Michael C. Geraghty, Attorney General, Juneau, for Appellee State of Alaska.

Before: Fabe, Chief Justice, Winfree, Stowers, Maassen, and Bolger, Justices.

STOWERS, Justice.

## I.  INTRODUCTION

Michael Reilly and Jaime Vinette[1] engaged in a non-marital relationship which resulted in the birth of their son Barlow.[2]  Reilly subsequently ceased to be employed in Alaska and moved to Butte, Montana, where he worked part time repairing and renting out homes and managing a bar.  Vinette has custody of Barlow during the school year, and Reilly has custody for six weeks during the summer.

Reilly moved to have his child support modified to reflect the fact that his income had fallen.  Vinette countered that he was voluntarily underemployed.  Reilly claimed that he could not work a full-time job because of his obligations to his special needs daughter from another relationship, the poor job market in his area, and his medical conditions.  The superior court found that Reilly could work full time and that he was voluntarily and unreasonably underemployed.  The court did not find credible Reilly's testimony regarding the various reasons he alleged that prevented him from working.  The superior court imputed income to Reilly based on the average wage in southwestern Montana for career paths the court believed Reilly would be qualified to pursue.

Reilly appeals, arguing that the imputation of income was improper, the amount to be imputed was calculated incorrectly, and the superior court erred in its written child support order by not including a visitation credit for his summers with Barlow.  We affirm the superior court's findings and orders, except that we remand the child support order for a correction of a minor omission of visitation credit.

---

[1]    At the time this case began, Jaime Vinette's name was Jaime Northrop.  She has since married and now goes by Jaime Vinette.

[2]    Pseudonyms are used for the children to protect their privacy.

## II.  FACTS AND PROCEEDINGS

### A.  Facts

Michael Reilly and Jaime Vinette engaged in a temporary, non-marital relationship which resulted in the birth of Barlow in February 2003.  The relationship had ended by the time of Barlow's birth.  At the time, both Reilly and Vinette lived in Anchorage.  Reilly worked as a "measurement while drilling engineer" earning approximately $66,000 per year.  Based on this income, Reilly's child support was originally set at $897 per month.  His engineering job required working on a rig for three months at a time.  According to Reilly, he was working 13 hours a day, seven days a week, on a 45-day-on, ten-day-off schedule.

In 2004 Reilly moved to Butte, Montana.  He initially worked as a handyman at a trailer park and repaired a home to rent out.  In 2005 Reilly worked for a short time for the Montana Department of Transportation as a civil engineer.  The reason Reilly lost this job is unclear; he claims he could not pass a test required for the position, while Vinette argues that it was a temporary position to begin with.

Reilly petitioned for a modification of his child support in 2004 and 2005.  The court granted the second petition and adjusted Reilly's support obligation down to $487 per month based on his income working for the State of Montana.[3]

After Reilly stopped working for the state, he started managing two rental properties which he owned; he also repaired other properties he owned to sell.  He used loans from his parents and a bank to buy a bar, which he managed and at which he bartended one night a week.  The bar was only open four nights a week, and he described it as being unprofitable.  Reilly claimed he used proceeds from his rental units to stay

---

[3]  This figure was later further adjusted down to $442 due to a change in Barlow's healthcare premiums.

current on the bar's mortgage.  He had not applied for an engineering job, or any other type of job, since 2008.

While living in Montana, Reilly had a second child.  His daughter Nancy was born in 2007.  Reilly lived with the child's mother for a time, but they separated in 2011.  At the time of the superior court hearing, Reilly had full-time custody of Nancy. He also had custody of Barlow for six weeks each summer.  Both children have special needs due to behavioral disorders.  Nancy has been diagnosed with bipolar disorder and Barlow has been diagnosed with attention deficit hyperactive disorder (ADHD), although he may have bipolar disorder as well.  The parties testified that Nancy has been rejected by many daycare facilities due to her behavioral problems.  Before Reilly assumed full-time custody of Nancy, Nancy's mother was forced to drop out of nursing school and was fired from several jobs due to difficulty finding daycare for Nancy.  Nancy is currently in therapy, and Reilly testified he must spend a significant amount of time caring for her and taking her to various medical appointments.  Nancy attends a special, government-run daycare for behaviorally challenged children from 10:00 a.m. through 2:00 p.m.  She receives behavioral counseling three times a week through a non-profit called AWARE. The parties testified that taking care of Barlow is also a "full-time job" and that "[Vinette] has a lot of trouble with [Barlow] too because he's got similar problems."

Reilly testified his only income was from his rental properties. He managed and repaired five units from which he earned approximately $13,000 per year.  He testified he worked about five to ten hours a week repairing his rental units and ten hours a week at the bar.  In total, Reilly claimed he worked about 20 hours a week.

B.    Proceedings

In July 2011 Reilly petitioned again for a reduction in his child support. He argued his child support should be based on the $13,023 he made from his rentals in

2010, and he submitted his 2010 tax returns to the Alaska Child Support Services Division (CSSD). CSSD recalculated his child support obligation based on the 2010 tax returns and issued a calculation showing that Reilly's support obligation should be lowered to $210 per month. Though initially CSSD petitioned the superior court to order this reduction, CSSD took the position at the evidentiary hearing that Reilly should be working full time and did not oppose the court imputing income to him. Vinette responded to CSSD's petition to modify support by asserting that Reilly was not being truthful about his income and that he was voluntarily underemployed.

The superior court held a hearing to determine Reilly's child support obligations. Reilly testified that he was unable to work full time because of his responsibilities caring for Nancy's special needs. He also alleged that he cannot hold a full-time job because he has Crohn's disease and an undiagnosed mental condition that prevents him from "work[ing] in a structured environment" or "work[ing] for [other] people."

In oral rulings the superior court found Reilly's testimony regarding these explanations to be dubious and unsubstantiated, and it found Reilly was voluntarily underemployed. However, due to the length of time since Reilly had last worked in engineering, the court decided not to impute income based on an engineer's salary. Instead, the court ordered CSSD to determine the average salary for a first-year college graduate in Butte, Montana. The court granted Reilly's request for a visitation credit for the six weeks he has custody of Barlow in the summer and ordered Reilly and Vinette to share the cost of Barlow's transportation for the summer visits. The court ordered that Reilly's visitation credit be 50% of his child support for the time during which he has Barlow, but he is only to receive visitation credit if he is current on his child support by May 15 of each year.

In response to the superior court's order, CSSD determined that the U.S. Department of Labor does not compile labor statistics specifically for Butte, Montana, so instead CSSD relied on statistics for the entire southwest Montana region. CSSD also could not find income statistics based on a general education or experience level, so it employed statistics based on career field. CSSD determined the closest match for Reilly's career field is "construction and extraction occupations." CSSD rejected the second-closest match, "building and grounds cleaning and maintenance occupations," because this field does not include specialities that require a college degree and many of the occupations in this field pay barely above minimum wage. In contrast, "construction and extraction occupations" includes a mix of fields that require a college degree and fields that do not. CSSD recommended to the court that the average wage for "construction and extraction occupations," $19.22 per hour or $39,977 per year, be imputed to Reilly and that he pay $526 per month in child support based on this figure.

The superior court adopted CSSD's recommendation and issued a written order requiring Reilly to pay $526 per month. However, the order failed to include the 50% visitation credit and shared travel expenses which the court had included in its oral rulings.

Reilly appeals from the superior court's decision on several points. He argues that the superior court should not have imputed income to him, that it calculated the imputed income based on impermissible evidence, and that it erred by failing to include the visitation credit in its final written order.[4]

---

[4] Reilly also asserted in his "Statement of issues presented for review" that the superior court's decision was biased and based on the court's personal feelings. As Reilly provided no argument on this point and did not mention it again in his brief, this argument is abandoned. *See Wetzler v. Wetzler*, 570 P.2d 741, 742 n.2 (Alaska 1977) (stating that we "will consider as abandoned questions set forth in the Points but not
(continued...)

## III. STANDARD OF REVIEW

We "review[] modifications of child support orders under an abuse of discretion standard. An abuse of discretion will be found only if, based on the record as a whole this court is left with a definite and firm conviction that a mistake has been made."[5] "Trial courts are granted broad discretion in fashioning child support determinations."[6] We review under an abuse of discretion standard the court's decision to impute income; we use a clearly erroneous standard for the decision regarding the amount of income to impute.[7] Assessing whether a parent is voluntarily underemployed is a question of fact, and we review factual findings for clear error.[8]

---

[4]    (...continued)
argued in . . . [the] brief").

[5]    *Robinson v. Robinson*, 961 P.2d 1000, 1002 (Alaska 1998) (citations and internal quotations omitted).

[6]    *Ward v. Urling,* 167 P.3d 48, 52 (Alaska 2007).

[7]    *See Helen S.K. v. Samuel M.K.*, 288 P.3d 463, 473 (Alaska 2012) ("We review the superior court's decision to impute income for abuse of discretion. The superior court's 'determination of an obligor's imputed income is a factual finding that we review for clear error.' "); *Sawicki v. Haxby*, 186 P.3d 546, 551 (Alaska 2008) ("The superior court did not abuse its discretion when it denied Annie's motion to reduce her child support payments. Finally, it was not clearly erroneous for the court to impute income of $52,000 to Annie."); *Shepherd v. Haralovich*, 170, P.3d 643, 647 (Alaska 2007) ("[I]t would not have been an abuse of discretion to impute some investment income."); *O'Connell v. Christenson*, 75 P.3d 1037, 1039 (Alaska 2003).

[8]    *Robinson*, 961 P.2d at 1004 (citing *Vokacek v. Vokacek*, 933 P.2d 544, 549 (Alaska 1997)).

## IV. DISCUSSION

### A. The Superior Court Had No Obligation To Accept CSSD's Initial Calculation.

Reilly contends that the superior court "did not take into consideration CSSD's information, research and findings pursuant to [Alaska] [C]ivil [R]ule 90.3." He argues that "CSSD followed the civil rules and laws governing [Alaska] child support" and that the superior court erred when it ignored CSSD's recommendation that Reilly's child support be reduced. However, CSSD only calculated Reilly's child support obligation based on the tax returns Reilly submitted, and thereafter Vinette objected on the grounds of voluntary underemployment. CSSD did not make any findings or determination whether Reilly was voluntarily underemployed. It is the court's responsibility to determine what the facts are and to determine what the law requires. Once the issue of Reilly's alleged underemployment became contested, it was solely for the court to find the facts and to issue an appropriate child support order. CSSD has no decision-making role to play in these judicial functions, and the court has no obligation to accept CSSD's initial calculation.[9]

### B. The Superior Court's Decision To Impute Income To Reilly Was Not An Abuse Of Discretion.

Reilly argues that the superior court erred in finding that he was voluntarily underemployed. Under Civil Rule 90.3(a)(4), income can be imputed to a parent when the court finds the parent voluntarily underemployed:

---

[9] See Alaska R. Civ. P. 90.3, which contains no requirement that the superior court follow CSSD's recommendation. *See McDonald v. Trihub*, 173 P.3d 416, 422-23 (Alaska 2007) (finding that a superior court order declining to follow a CSSD child support calculation was not an impermissible retroactive modification of child support because the CSSD order had not yet gone into effect).

The court may calculate child support based on a determination of the potential income of a parent who voluntarily and unreasonably is unemployed or underemployed. A determination of potential income may not be made for a parent who is physically or mentally incapacitated, or who is caring for a child under two years of age to whom the parents owe a joint legal responsibility. Potential income will be based upon the parent's work history, qualifications, and job opportunities.

In deciding whether to impute income, the superior court should consider the totality of the circumstances.[10] The court must make specific findings that the underemployment is both voluntary and unreasonable.[11]

The court may find that underemployment is voluntary even if the underemployment is in good faith.[12] A parent can be found to be voluntarily underemployed if he "has engaged in 'voluntary conduct for the purpose of becoming or remaining unemployed' or underemployed. The key inquiry is whether the lack of employment is the result of 'economic factors' or of 'purely personal choices.' "[13] "[T]he relevant inquiry under Civil Rule 90.3 is simply whether a parent's current

---

[10] *Kestner v. Clark*, 182 P.3d 1117, 1122 (Alaska 2008) (citing Alaska R. Civ. P. 90.3 cmt. III.C).

[11] *Barlow v. Thompson*, 221 P.3d 998, 1003 (Alaska 2009).

[12] *Robinson v. Robinson*, 961 P.2d 1000, 1004 (Alaska 1998) (citing *Kowalski v. Kowalski,* 806 P.2d 1368, 1371 (Alaska 1991)).

[13] *Nunley v. State, Dep't of Rev., Child Support Enforcement Div.*, 99 P.3d 7, 11 (Alaska 2004) (quoting *Bendixen v. Bendixen*, 962 P.2d 170, 172 (Alaska 1998); *Vokacek v. Vokacek*, 933 P.2d 544, 549 (Alaska 1997)).

situation and earnings reflect a voluntary and unreasonable decision to earn less than the parent is capable of earning."[14]

The court must also find that the unemployment or underemployment is unreasonable.[15] "The court must consider the 'totality of the circumstances' in deciding whether an obligor is unreasonably underemployed."[16] Factors the superior court should consider include "whether the obligor's reduced income is temporary, whether the change is 'the result of economic factors or of purely personal choices,' the children's needs, and the parents' needs and financial abilities."[17] Even if the decision to be unemployed is legitimately in the best interest of the parent's subsequent family, it can still be unreasonable in light of the parent's paramount duty to support *all* of his children.[18]

The superior court's finding that Reilly chose to be underemployed, even if he could work, is amply supported by the record.[19] However, Reilly contends that his underemployment is not voluntary because three circumstances each individually make it impossible for him to hold a full-time job: (1) his medical conditions; (2) the fact he could not find full-time employment when he last sought it; and (3) his daughter's

---

[14]     *Id.* at 12.

[15]     *Sawicki v. Haxby*, 186 P.3d 546, 550 (Alaska 2008) (citing Alaska R. Civ. P. 90.3(a)(4)).

[16]     *Id.* (citing Alaska R. Civ. P. 90.3 cmt. III.C).

[17]     *Sawicki*, 186 P.3d at 550 (citations omitted).

[18]     *Kestner v. Clark*, 182 P.3d 1117, 1123 (Alaska 2008).

[19]     Reilly made the following statements: "Me and my children cannot work in [a] structured environment," and "I will never get a full-time job . . . . But you know, this is what I'm going to do for the rest of my life. I'm going to — you know, I'm not going to work full time."

special needs. Reilly bears the burden of proof in demonstrating that these circumstances truly prevent him from working, and he must show that they are extreme circumstances.[20]

### 1. The superior court did not clearly err in finding that Reilly can work full time despite his medical conditions.

Reilly argues that he has "major medical issues that hinder him from getting a larger income." He claims the superior court "ignored" the fact that he has a broken ankle and Crohn's disease.

Reilly mentioned his broken ankle for the first time in his Statement of Points on Appeal. He did not mention his ankle in the superior court, either in his briefing or during the hearing. We "will not consider on appeal new arguments which (1) 'depend on new or controverted facts,' (2) are not closely related to the appellant's arguments at trial, and (3) could not have been gleaned from the pleadings, unless the new issue raised establishes plain error."[21] Reilly's broken ankle was not closely related to his arguments at trial, nor could this fact have been gleaned from the pleadings. The new broken-ankle issue also does not establish plain error. A broken ankle is usually a temporary condition, and normally we will not modify child support due to temporary conditions.[22] Thus, even if Reilly had raised the broken-ankle argument in the superior court, it is unlikely it would have been grounds for a modification.

---

[20]     *Kestner*, 182 P.3d at 1123.

[21]     *Krossa v. All Alaskan Seafoods, Inc.*, 37 P.3d 411, 418-19 (Alaska 2001) (quoting *Arnett v. Baskous*, 856 P.2d 790, 791 n.1 (Alaska 1993)).

[22]     *See Patch v. Patch,* 760 P.2d 526, 530 (Alaska 1988) ("[A] trial court should be reluctant to modify child support obligations when the obligor's loss of income appears only temporary."); *see also Richardson v. Kohlin,* 175 P.3d 43, 48 (Alaska 2008) ("[W]e have held that parents going through what appear to be temporary periods of unemployment can be expected to maintain their support obligation by using assets, and that ordinarily support should not be modified for temporary reductions in income.").

The superior court did consider Reilly's Crohn's disease. The court asked Reilly whether he had any documentation from his doctor or other evidence that his Crohn's disease prevented him from working full time. Reilly admitted that he had not submitted any documentation.

The court found that Reilly had a diagnosed medical disease that "apparently flares up when there's stress, [and] can be controlled by medications, some of which he takes and some of which he doesn't." However, the court concluded that it had "no evidence that [Crohn's disease] precludes him from working full time." These findings accurately reflect the testimony of the witnesses. Thus, the court considered Reilly's testimony concerning his disease but simply did not find credible his claim that the disease prevented him from working.[23] The superior court's finding was not clearly erroneous.

### 2. The superior court did not clearly err in finding that Reilly can work full time.

Reilly next argues that the superior court did not consider the fact he was unable to obtain employment when he last applied at the Montana job service. However, the court's findings show it did consider this fact. Reilly testified he had tried but failed to find engineering work through Montana's job service and through other avenues. The court acknowledged this testimony by deciding that, given the passage of time since Reilly last held an engineering job, he could not be expected to find one now. Moreover, Reilly admitted he had not looked for any full-time jobs besides engineering jobs. Thus, the court did not ignore his testimony when it found he could obtain a full-time, non-

---

[23]     *See McLaren v. McLaren*, 268 P.3d 323, 331 (Alaska 2012) ("It is the function of the trial court, not the reviewing court, to judge the credibility of witnesses and to weigh conflicting evidence.").

engineering-related job. The court's decision to impute income despite Reilly's previous inability to find work was not clearly erroneous.

### 3. The superior court did not clearly err in finding that Reilly can work full time despite Nancy's special needs.

Finally, Reilly argues the superior court erred in finding that he can work full time even though he has to care for Nancy, his four-year-old daughter from a subsequent relationship who has special needs due to her behavioral problems. Reilly and Vinette both offered testimony about the severity of Nancy's behavioral issues and the difficulty of finding her daycare. Reilly explained that he must spend a significant amount of time taking Nancy to appointments with doctors, counselors, and psychiatrists, and that it would be impossible to work a full-time job around Nancy's schedule.

Subsequent children normally cannot diminish a parent's obligation to provide for prior children.[24] As the commentary to Civil Rule 90.3 explains:

> A parent with a support obligation may have other children living with him or her who were born or adopted after the support obligation arose. The existence of such "subsequent" children, even if the obligor has a legal obligation to support these children, will not generally constitute good cause to vary the guidelines. However, the circumstances of a particular case involving subsequent children might constitute unusual circumstances justifying variation of support. The court should reduce child support if the failure to do so would cause substantial hardship to the "subsequent" children.[25]

We adopted this principle in *Kestner v. Clark*, where we held that:

---

[24]     *Kestner*, 182 P.3d at 1122-23.

[25]     Alaska R. Civ. P. 90.3 cmt. VI(B)(2) "Subsequent Children." Though we have not officially adopted the commentary to the Rules of Civil Procedure, we do rely on it for guidance. *See Caldwell v. State*, 105 P.3d 570, 573 n.6 (Alaska 2005) (citing *Eagley v. Eagley*, 849 P.2d 777, 779 (Alaska 1993)).

Parents have a paramount duty to support their children. New obligations incurred after the birth of the parent's first child do not diminish that duty. . . . [A] rule relieving a parent of his obligation to support a prior child because of the birth of a subsequent child would "quite literally allow . . . the non-custodial parent to sire himself out of his child support obligation." Because of the significance of a parent's duty to meet his or her child support obligations, we prioritize fulfillment of that duty over even "legitimate" decisions to be voluntarily unemployed or underemployed.[26]

A parent with subsequent children can be relieved of the duty to support his prior-born child only "under the most extreme circumstances": the parent wishing to escape imputed income must prove imputed income resulting in an increase in child support which would "cause substantial hardship to [his] subsequent children."[27] The burden of proof is on the parent to show that working full time would create a substantial hardship for the subsequent child and that the situation presents an *extreme* special need.[28]

During the hearing, Reilly made no differentiation between the burdens imposed by Nancy and Barlow, stating, "I mean, my son is special needs too, . . . we have learning disorders," and "I know [Vinette] has a lot of trouble with my son too because *he's got similar problems* and it's difficult on all of us." (Emphasis added.) Reilly testified that "it's just like — my son and my daughter. We can't work under structured — under structure."

---

[26] *Kestner*, 182 P.3d at 1122-23 (quoting *Bailey v. Bailey*, 724 So. 2d 335, 339 (Miss. 1998)).

[27] *Id.* at 1123.

[28] *Id.*

The court asked Vinette, "Can you compare the circumstances of [Nancy] in what your circumstances are with [Barlow]?" She answered, "They are very similar." When the court asked Reilly if he thought taking care of Barlow was a full-time job, he answered, "Yeah, it is." When asked by Vinette why it is that she can work full time and take care of Barlow while he cannot work full time and take care of Nancy, Reilly's answer was that "well some people (indiscernible) better than others. . . . [W]ell, why you have a better job than me, why — why is there people homeless on the streets, you know?"

Further, Barlow may have bipolar disorder, like Nancy. Vinette testified that "currently, my son has gone through an evaluation to help determine what may be wrong with him . . . . His doctor believes that he is bipolar, but we wanted more information before he was officially diagnosed with that." She explained that Barlow is on medication for his ADHD, but the medication does not alleviate his behavioral problems, suggesting that he may have additional mental disorders. Vinette also stated that the two children are similar enough that she and Nancy's mother discuss the problems they see with Barlow and Nancy to "figure out what might be wrong with our children."

The superior court recognized in its findings that Nancy has special needs. However, the court did not find credible Reilly's testimony that Nancy's medical or other special needs prevent him from working full time, and it decided that Reilly had not provided adequate evidence to support his claim. The court explained:

> [Reilly] claims that it's necessary for him to [work only 20 hours a week] because of his obligations to his daughter, making it impossible for him to work full time. But I would find that [Vinette] is able to do work full time and manage the needs of her similarly special needs son at the same time and I see no reason why Reilly can't do that as well.

It was permissible for the superior court to compare Nancy's special needs with Barlow's special needs — the parents themselves essentially equated the children's levels of need and attention — and it was not error for the court to find under these circumstances that Reilly could work full time while providing for Nancy's special needs, just as Vinette worked full time and provided for Barlow's special needs.

The superior court acknowledged that it was imposing a hardship, noting that "[Reilly] could work a full-time job, . . . it would be certainly difficult, but it would be no more difficult than it is for [Vinette]." The court concluded that it was possible for Reilly to work a full-time job while "managing [Nancy's] needs."[29]

Reilly bore the burden of proof that his circumstance was a "most extreme circumstance" and that Nancy would suffer a substantial hardship if he worked full time. The superior court weighed Reilly's testimony but did not find it credible. The court did not clearly err by finding that Reilly had not met this burden.[30]

To summarize, the factual findings made by the superior court that Reilly was voluntarily and unreasonably underemployed are supported by the record and are not clearly erroneous. The superior court did not abuse its discretion in deciding to impute income to Reilly.

---

[29]     Reilly did not present any of Nancy's medical records or counseling records. The only evidence he presented regarding the severity of her issues was his and Vinette's testimony.

[30]     It appears that in the course of seeking to obtain a fuller view of the parties' circumstances, the court, like the parties themselves, asked for hearsay information. The parties were pro se and probably did not understand they could have objected. It is true that unobjected hearsay can be considered by the court. *See Cassell v. State*, 645 P.2d 219, 221 (Alaska App. 1982). But under some circumstances, it may be unfair for a trial court to elicit hearsay on which it intends to rely. It is not clear in this case that the court actually relied on any of the hearsay in making its findings or reaching its conclusions.

**C.    The Superior Court Correctly Calculated Reilly's Imputed Income.**

Reilly also argues that the superior court did not correctly calculate his imputed income. He contends that the court determined his income based on "assumptions" instead of following the standard formula in Civil Rule 90.3 and that the court should have used his educational background to determine the imputed income.[31]

We review the superior court's determination of the amount of income to impute for clear error.[32] "A trial court is required to make specific findings to support a determination of adjusted income under Civil Rule 90.3."[33] "Rule 90.3(a)(4) does not rigorously command pursuit of maximum earnings. The rule's more modest objective is to give courts broad discretion to impute income based on realistic estimates of earning potential."[34] We have observed that "[a]n important reason — if not the chief reason — for imputing income to a voluntarily underemployed parent is to goad the parent into full employment by attaching an unpleasant consequence (a mounting child support debt or, in certain cases of shared custody, a reduced child support payment) to continued inaction."[35] Generally speaking, "[a] trial court is granted discretion to choose 'the best

---

[31]    Reilly asserts that "the [supreme court] should review the question of why [Reilly's] child support increased based on an occupational code not related to his educational background." This is an odd argument because Reilly's educational background is in engineering and using an engineering-based occupational code to impute income to him would result in imputing more income than the superior court ultimately decided to impute.

[32]    *O'Connell v. Christenson*, 75 P.3d 1037, 1039 (Alaska 2003).

[33]    *Koller v. Reft*, 71 P.3d 800, 805 (Alaska 2003).

[34]    *Beaudoin v. Beaudoin*, 24 P.3d 523, 530 (Alaska 2001).

[35]    *Id.*

indicator of . . . future earning capacity' and to 'impute income based upon 'the most complete evidence before it.' ''[36]

If a parent's educational background is not the best indicator of his earning capacity, the superior court can rely on other evidence.[37] Here, the superior court made a specific finding that Reilly's educational background was not a fair indicator of his income potential, noting that:

> I do not believe at this time, given that the last time he worked an engineering job, it's appropriate to base his voluntarily unemployment salary based on an engineer's earning capacity, particularly with the limited information about in the economy as it exists today, which is not great around the country.

It was neither clear error nor an abuse of discretion for the superior court to impute income based on an occupational code that is closely related to Reilly's current occupation and circumstances rather than his educational background. We also note that the superior court did consider that Reilly had a college degree; that was the rationale for imputing income based on the average salary for a first-year college graduate.

The superior court ultimately agreed with CSSD's advice that the average income of workers in "construction and extraction occupations" in southwest Montana (as reported by the U.S. Department of Labor) was the best indicator of Reilly's potential income. The court explained that several of the sub-specialities included in "construction and extraction occupations" are similar to Reilly's work repairing and renovating houses

---

[36] *Ward v. Urling*, 167 P.3d 48, 55 (Alaska 2007) (quoting *Virgin v. Virgin*, 990 P.2d 1040, 1049 (Alaska 1999); *Byers v. Ovitt*, 133 P.3d 676, 682 (Alaska 2006)); *see also Koller*, 71 P.3d at 805.

[37] *Ward*, 167 P.3d at 55.

he then sells or leases.[38] The court's approach is the type of approach we have instructed the superior courts to use when determining imputed income.[39] Thus, the court did not clearly err in determining Reilly's imputed income. Furthermore, the court's decision to not impute to Reilly an engineering salary and instead impute a much lower salary was fair and reasonable.

**D.** **The Superior Court's Oral Visitation Credit Was Permissible, But The Credit Was Omitted From The Final Order.**

Reilly contests the superior court's oral decision to award him only a 50% visitation credit for the months that Barlow spends with him in the summer. According to Civil Rule 90.3(a)(3): "The court *may* allow the obligor parent to reduce child support payments by up to 75% for any period in which the obligor parent has extended visitation of over 27 consecutive days. The order must specify the amount of the reduction." (Emphasis added.) The superior court has discretion regarding when to credit the obligor parent and how much credit to give.[40] The superior court must show it considered the issue whether to grant the credit, and it must expressly make findings regarding the issue.[41] Reilly is incorrect when he argues that the visitation credit is "required by Alaska state law." The law does not require the superior court to award the credit.

---

[38] Examples of sub-specialities included in "construction and extraction occupations" that seem to be closely related to Reilly's current work include "carpenter," "construction laborer," "electrician," "painter[], construction and maintenance," and "construction and building inspector."

[39] *See O'Connell v. Christenson*, 75 P.3d 1037, 1041 (Alaska 2003).

[40] *Renfro v. Renfro*, 848 P.2d 830, 832 (Alaska 1993).

[41] *Id.*

Here, the superior court clearly considered the issue. The court questioned Vinette and Reilly about whether they believed a summer visitation credit would be fair. Both parties agreed a visitation credit would be fair, but Vinette mentioned she must continue paying Barlow's Alaska daycare expenses during his visit to Montana in order to hold his place. The court commented that it would likely not award a full reduction in child support, rather the credit would be between 50% and 75%, so she would still receive some support for the daycare payments.

The superior court's oral ruling granted Reilly a 50% visitation credit and provided that the parties would share the cost of Barlow's travel, but only if Reilly is current on his child support by May 15 of each year. The court did not abuse its discretion by awarding a 50% credit, which was reasonable considering that Reilly does not have Barlow for a full summer.

However, Reilly is correct that the superior court erred by not including the visitation credit in its final written order. The parties agree the visitation credit was omitted from the written order. Thus, we remand this issue to the superior court so that it can correct this omission.

### E. Reilly's Argument That His Child Support Cannot Be Increased Because Neither Party Requested An Increase Is Without Merit.

Reilly finally argues that "[t]he [superior] court erred in increasing the child support even though the [a]ppellee did not ask [for] or want the increase." This argument appears to be based on the fact that Vinette did not file a motion to increase Reilly's child support. But she did not have to file a motion; instead, she opposed Reilly's motion to modify his child support downward, arguing that he should actually pay more child support because he was "voluntarily unemployed." During the hearing she again stated that she did not think Reilly's child support should reflect his current

employment situation. Reilly's argument that his child support obligation cannot be increased because neither party requested an increase is without merit.

## V. CONCLUSION

We AFFIRM the decision of the superior court in all respects, except that we REMAND the superior court's child support order so that the court can correct the inadvertent omission of the visitation credit in its written order.