NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| MICHAEL DUNLAP, | ) | |
| | ) | Supreme Court No. S-16564 |
| Appellant, | ) | |
| | ) | Superior Court No. 1JU-14-00894 CI |
| v. | ) | |
| | ) | MEMORANDUM OPINION |
| SHAWNA DUNLAP, n/k/a SHAWNA | ) | AND JUDGMENT* |
| STARR, | ) | |
| | ) | No. 1715 – March 13, 2019 |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, First Judicial District, Juneau, Louis J. Menendez, Judge.

Appearances: Katie Banaszak, Assistant Public Advocate, Palmer, and Richard K. Allen, Public Advocate, Anchorage, for Appellant. No appearance by Appellee Shawna Starr.

Before: Stowers, Chief Justice, Winfree, Maassen, Bolger, and Carney, Justices.

## I. INTRODUCTION

The superior court found that a father whose work consisted primarily of seasonal employment on ice roads and pipelines was voluntarily underemployed and imputed income to him by multiplying his most recent winter hourly wage by 40 hours per week and 52 weeks per year. The father appeals, challenging the court's decision to

---

    *     Entered under Alaska Appellate Rule 214.

impute income to him and its method of calculating the imputed income. We are unable to ascertain why the superior court found the father's underemployment was voluntary, and the court made no finding that the underemployment was unreasonable; we therefore vacate the child support order and remand for further explanation. We also reverse the superior court's imputation of income as clearly erroneous.

## II.    FACTS AND PROCEEDINGS

Michael Dunlap and Shawna Starr married in December 1988 in Juneau.[1] Starr filed for divorce in October 2014. Dunlap and Starr had six children. At the time of trial two of the children were still minors, and one adult child had Down's Syndrome and required a custody determination. The superior court bifurcated the case, holding a trial on the issues of divorce, child custody, and visitation in January 2016 and a trial on the issues of child support, property, and debt in May 2016.

The court issued a decree of divorce in January 2016, a property division and child support order in November 2016, and a child custody order in December 2016. The court awarded Starr primary physical and sole legal custody of the three children. It imputed income to Dunlap of $66,754.80 and awarded child support for the two minor children based on this figure. Dunlap appeals only the court's decision to impute income to him and its calculation of that imputed income.

### A.    Evidence Related To Imputed Income

Dunlap's 2014 and 2015 tax returns were admitted at trial. According to these returns, Dunlap's income in 2014 was $59,979 and his income in 2015 was $42,532.

Testimony about how much Dunlap worked and his earning potential was

---

[1] Starr's last name was Dunlap but her last name was restored to Starr in the divorce decree.

scattered through both the January and May trials. Dunlap testified about his work history. He stated that for the last five years he had worked primarily doing construction on ice roads or working on pipelines. Over his career he also worked in Juneau, doing various odd jobs. He explained that he worked projects, so the amount he was able to work varied dramatically, and that he did not work at all in some years. He testified that he made "40 some thousand" dollars in the average year.

Dunlap provided a time line of his work history in the years leading up to trial, starting in 2013. He testified to working a "short job" up north in October 2013. He then worked again up north, starting before Thanksgiving and into December 2013 before being sent home with the flu. On New Years Day 2014 he returned to work and worked until April. In Fall 2014 he worked a job as an end dump driver for Miller Construction in Juneau. He explained that the job was temporary and that he worked on an on-call basis a "[f]ew days here, few days there." He testified that he never liked this type of work situation, saying, "I'd prefer to work seven twelves or more and earn what I can while I can." He next worked in January 2015 but was only able to work for a "couple weeks" up north before he injured his back and had to be sent to Anchorage for medical care. He waited for one month to go back to work, but after a month he was laid off. He then worked for Price Gregory in the Kuparuk area, west of Prudhoe, starting about the third week of February 2015. This job lasted six weeks. He worked for three weeks in May 2015 at the Juneau airport for Alaska Juneau Construction before being laid off after he clipped a fence with the truck he was driving. He collected unemployment from May through July and then again starting in October 2015. Meanwhile, he got calls about jobs up north in both September and December 2015, but he was later informed that he could not be hired because of workers' compensation issues stemming from his back injury. He said he was told these issued were resolved in September but then the same thing happened in December. This brought his work

history current as of the January 2016 trial.

Dunlap next testified about his job prospects. He explained that he was in good standing with his union and that he had worked for multiple companies up north over the years and was in good standing with a number of them. He testified that there was a remote hire list for jobs up north and that he had not put himself on this list because he was "waiting on the divorce proceedings to resolve." He explained, "[A]s it got closer to the court trial date I just didn't call and tell them I was ready to go north, but I did have a close friend go to work last week . . . , and I told them, tell them I'll be ready after this date." He testified that he expected to work soon. He was later asked on cross-examination, "[Y]ou had stated you haven't been working not because you couldn't work and you hadn't made the call to work because you were waiting for this case to be resolved; is that accurate?" He replied, "More towards the latter part of the year, like December."

Starr called Cherry Love Helms, payroll administrator for Price Gregory, to testify about Dunlap's salary. Helms testified that when Dunlap worked for Price Gregory in March 2016 his salary was $30.11 per hour. She explained that overtime pay was $45.17 per hour and that he had in fact received overtime. Helms said she believed that this project had a six-weeks on, one-week off rotation. The previous year his salary had been $29.48 per hour. Before that, the last time Dunlap worked for Price Gregory was in 2009, when he earned $29.50 per hour. She also testified that he was eligible to receive bonuses on some projects and that he had received bonuses in the past. Helms testified that work at Price Gregory was by project and that it was not possible to work a regular full-time job there because there would be no work after a project ended. According to Helms, Dunlap was laid off from his last project because there was no more work available. She testified that Price Gregory had projects year-round.

Starr also called Dunlap to the stand to testify about his financial situation.

He verified the information on his bank statements that showed Price Gregory had deposited $10,880.69 in wages in his account from February 5 to March 11, 2016. Dunlap also testified that he received dividends from the Sealaska Corporation twice a year and that in 2015 the dividends were for $953 and $1,051. He stated that he received dividends from the Goldbelt Corporation twice a year. He was asked whether the last dividend was for approximately $50, and he responded that he did not recall.

## B.  Superior Court Ruling On Imputed Income

Starr requested that the superior court impute income to Dunlap. She suggested the court multiply Dunlap's most recent hourly rate ($30.11 per hour) by a 40-hour work week for 52 weeks per year, for a total potential income of $62,628.80, then add Dunlap's permanent fund dividend ($2,072), his Sealaska dividends ($2,004), and his Goldbelt dividends ($50). This results in a total annual imputed income of $66,754.80. Dunlap argued that his child support should be calculated using his 2015 tax return, which reported an income of $42,532. The superior court agreed with Starr and imputed the income as she requested.

The superior court found that Dunlap had been voluntarily underemployed:

> Mr. Dunlap's tax filings for the past two years are not an adequate reflection of his earning potential because he has admitted that he has not actively attempted to work as much as he could have because of these pending court dates. However, Mr. Dunlap has taken few steps to adequately prepare his case, despite having ample time to do so. Based on the record before it, this court hereby finds that Mr. Dunlap has been voluntarily under[]employed for the past two years during the pendency of this case. The court's issuance of this order shall resolve the pending issues in this case. Therefore, Mr. Dunlap will have the ability to undertake additional union contracts to increase his salary.

> With regard to the calculation of the amount of imputed income, the

superior court acknowledged that Dunlap does not work a full-time job with guaranteed income and that his income fluctuates significantly. The court said, "While it is possible that Mr. Dunlap will make more than the proposed imputed salary, it is also possible that he will make less." It explained that the calculation did not take into account that Dunlap earned overtime pay at a higher rate or that he could receive bonuses. And the court noted that Dunlap had made $10,880.69 from February 5 to March 11, 2016. Thus the court imputed the proposed salary of $66,754.80 to Dunlap.

Dunlap appeals the superior court's determination that he was voluntarily and unreasonably underemployed and its calculation of the amount of income to impute. Starr did not file a brief in this appeal.

## III.  STANDARD OF REVIEW

"We review under an abuse of discretion standard the court's decision to impute income; we use a clearly erroneous standard for the decision regarding the amount of income to impute."[2]  Whether a parent is voluntarily and unreasonably underemployed is a question of fact that we review for clear error.[3]  "Whether there are sufficient findings for informed appellate review is a question of law."[4]

## IV.  DISCUSSION

### A.  The Superior Court's Findings That Dunlap Was Voluntarily Underemployed Are Insufficient To Enable Appellate Review.

Alaska Civil Rule 90.3(a)(4) allows the superior court to impute potential income when calculating child support:  "The court may calculate child support based

---

[2]  *Reilly v. Northrop*, 314 P.3d 1206, 1212 (Alaska 2013).

[3]  *See id.* (citing *Robinson v. Robinson*, 961 P.2d 1000, 1004 (Alaska 1998)); *Barlow v. Thompson*, 221 P.3d 998, 1003 (Alaska 2009).

[4]  *Horne v. Touhakis*, 356 P.3d 280, 282 (Alaska 2015) (quoting *Hooper v. Hooper*, 188 P.3d 681, 685 (Alaska 2008)).

on a determination of the potential income of a parent who voluntarily and unreasonably is unemployed or underemployed. . . . Potential income will be based upon the parent's work history, qualifications, and job opportunities." We have explained:

> In deciding whether to impute income, the superior court should consider the totality of the circumstances. *The court must make specific findings that the underemployment is both voluntary and unreasonable.*
>
> The court may find that underemployment is voluntary even if the underemployment is in good faith. A parent can be found to be voluntarily underemployed if he "has engaged in 'voluntary conduct for the purpose of becoming or remaining unemployed' or underemployed. The key inquiry is whether the lack of employment is the result of 'economic factors' or of 'purely personal choices.' " "[T]he relevant inquiry under Civil Rule 90.3 is simply whether a parent's current situation and earnings reflect a voluntary and unreasonable decision to earn less than the parent is capable of earning."
>
> The court must also find that the unemployment or underemployment is unreasonable. "The court must consider the 'totality of the circumstances' in deciding whether an obligor is unreasonably underemployed." Factors the superior court should consider include "whether the obligor's reduced income is temporary, whether the change is 'the result of economic factors or of purely personal choices,' the children's needs, and the parents' needs and financial abilities."[5]

Dunlap argues that he was not voluntarily or unreasonably underemployed because his periods of unemployment were due to economic factors and not personal

---

[5]      *Reilly*, 314 P.3d at 1213(alteration in original) (emphasis added) (citations omitted) (first quoting *Nunley v. State, Dep't of Revenue, Child Support Enf't Div.*, 99 P.3d 7, 11-12 (Alaska 2004); then quoting *Sawicki v. Haxby*, 186 P.3d 546, 550 (Alaska 2008)).

choices. He notes trial testimony that he had been laid off multiple jobs, both up north and in Juneau, and that he was determined to be ineligible for two jobs due to workers' compensation issues. He also argues that his work is project-based and that it is unreasonable to assume that a new project would be available immediately after the earlier project ended. Thus, he argues, any underemployment was not voluntary.

The superior court explained that Dunlap "admitted that he ha[d] not actively attempted to work as much as he could have because of these pending court dates." Specifically, Dunlap testified that there was a remote hire list for jobs up north and that he "could call them and let them know [he was] ready" but that he had not because he was "waiting on this situation to resolve." "[A]s it got closer to the court trial date [he] just didn't call and tell them [he] was ready to go north." The superior court found that "Dunlap ha[d] been voluntarily under[]employed for the past two years during the pendency of this case."

But the court did not explain how it weighed the undisputed facts that Dunlap had been laid off multiple jobs, both up north and in Juneau, and that he was determined to be ineligible for two jobs due to workers' compensation issues. Nor did the court explain how it evaluated the fact that Dunlap's employment was mostly project-based and why it would be reasonable to assume that a new project would be available immediately after an earlier project ended. Many jobs in Alaska are rotational or seasonal in the construction, trade, fisheries, tourism, and other industries, and we have never held that an employee who works in these trades must find full-time, year-round employment for purposes of child support calculations. The superior court must consider these factors in its analysis of the totality of the circumstances.

Second, Dunlap argues that work on the North Slope requires being away from his family for long periods of time. He construes the superior court's calculation of imputed income, which uses 52 weeks, as the court requiring him to work 52 weeks

per year, which would mean that he almost never got to see his family.  And Dunlap notes that such full-time work on the North Slope might not even be available.  In Dunlap's last job he worked six weeks on, one week off, suggesting that it would not be possible to attain work for 52 weeks per year.  It may be that the superior court's decision did not presume that Dunlap should work 40 hours per week, 52 weeks per year.  The court acknowledged that Dunlap's work was contractual in nature and was "not a full-time job with a guaranteed income."  It quoted Dunlap's testimony that his income fluctuated and explained that it was possible Dunlap would make more or less than the imputed salary.  It noted that Dunlap had earned $10,880.69 in roughly one month in 2016 and that Dunlap could earn overtime wages and bonuses, which were not included in the imputed salary.  It may be that the court used 52 weeks simply as a way to calculate imputed income; but the practical effect of the court's calculation is that Dunlap must work an equivalent of 52 weeks per year.  The court's explanation why it employed a 52-weeks-per-year equivalent is insufficient given that there is no evidence Dunlap ever worked a full time, 52-weeks-per-year job.

The superior court also did not explicitly find that Dunlap was unreasonably underemployed.  The court quoted Civil Rule 90.3(a)(4)'s requirement that a parent be voluntarily and unreasonably underemployed in order to impute income to him, and it expressly weighed the relevant factors — "work history, job qualifications, and job opportunities."[6]  The court also made a point of explaining that Dunlap "has admitted that he has not actively attempted to work as much as he could have because of these pending court dates [i.e., the divorce and custody trial]."  The court also found that, notwithstanding Dunlap's explanation for why he had not actively attempted to work, he had "taken few steps to adequately prepare his case, despite having ample time

---

[6]  *See Barlow*, 221 P.3d at 1003; Alaska R. Civ. P. 90.3(a)(4).

to do so." But the court never expressly found that Dunlap's failure to seek employment was unreasonable. Given the problems we identify above — Dunlap's having been laid off from several jobs and his workers' compensation injury precluding him from being able to work, as well as the seasonal or rotational nature of his work — we cannot infer from this record that the superior court implicitly found Dunlap to be unreasonably underemployed.[7]

We therefore vacate the superior court's child support order and remand for further explanation and findings with respect to both voluntary underemployment and the reasonableness or unreasonableness of that underemployment.

## B. The Superior Court's Income Calculation Was Clearly Erroneous.

When the superior court decides to impute income to a parent, the court "is required to make specific findings to support [its] determination of adjusted income."[8] Such findings are reviewed for clear error.[9] "Generally speaking, '[a] trial court is granted discretion to choose "the best indicator of . . . future earning capacity" and to "impute income based upon 'the most complete evidence before it.' " ' "[10]

---

[7] *See Burrell v. Burrell*, 696 P.2d 157, 162 (Alaska 1984) ("The superior court did not make factual findings or articulate its reasoning with sufficient particularity to enable review of its holding."); *see also Tillmon v. Tillmon*, No. S-13619, 2011 WL 1599732, at *2 (Alaska Apr. 27, 2011) ("Because we are unable to discern the superior court's reasoning for setting June 1, 2007, as the effective date of the ongoing child-support obligation, we remand this issue to the superior court for either imposition of May 1, 2007, as the starting date of the ongoing obligation or explanation as to why May 1, 2007, should not be used.").

[8] *Reilly*, 314 P.3d at 1217 (quoting *Koller v. Reft*, 71 P.3d 800, 805 (Alaska 2003)).

[9] *Id.*

[10] *Id.* (alterations in original) (quoting *Ward v. Urling*, 167 P.3d 48, 55

(continued...)

"Rule 90.3(a)(4) does not rigorously command pursuit of maximum earnings. The rule's more modest objective is to give courts broad discretion to impute income based on realistic estimates of earning potential." We have observed that "[a]n important reason — if not the chief reason — for imputing income to a voluntarily underemployed parent is to goad the parent into full employment by attaching an unpleasant consequence (a mounting child support debt or, in certain cases of shared custody, a reduced child support payment) to continued inaction."[11]

Dunlap argues that the superior court clearly erred by using 52 weeks in its calculation of imputed income, both because Dunlap last worked six-weeks on, one week off, which results in roughly 7.5 weeks of unemployment per year, and because it was unreasonable to assume that work would be available to Dunlap for 52 weeks per year.

Helms, the payroll administrator for Price Gregory, testified that Dunlap's last job had been six-weeks on, one week off. Helms also testified that Dunlap had worked overtime. And Dunlap testified that he did not like his on-call job as an end dump driver for Miller Construction, saying, "I never liked that kind of situation. I'd prefer to work seven twelves or more and earn what I can when I can." This suggests Dunlap's typical employment up north involved significant overtime during periods when he was working. Nevertheless, no evidence showed that Dunlap ever earned on a regular basis the equivalent of full time work for 52 weeks per year.

Dunlap's work was mainly seasonal and was project-based. The superior court acknowledged that Dunlap's work was contractual in nature and was "not a full-time job with a guaranteed income." It quoted Dunlap's testimony that his income

---

**10**    (...continued)
(Alaska 2007)).

**11**    *Id.* (alteration in original) (quoting *Beaudoin v. Beaudoin*, 24 P.3d 523, 530 (Alaska 2001)).

fluctuates and said that it was possible Dunlap would make more or less than the imputed salary. The court noted that Dunlap had earned $10,880.69 in roughly one month in 2016. Dunlap's 2014 tax return, one of two that appears in the record, shows an income of $59,979; this is the most income Dunlap had earned, at least according to the record. This amount is $6,775.80 less than the income the superior court imputed to Dunlap.[12]

The superior court's imputation of income thus used a union wage scale for Kuparuk work and was based on a 40-hours-per-week, 52-weeks-per-year employment. But the record reflects that Dunlap never worked such a full-time job at such a rate. And there is nothing else in the record to tether the court's calculation to Dunlap's earning capacity. "Generally speaking, '[a] trial court is granted discretion to choose "the best indicator of . . . future earning capacity" and to "impute income based upon 'the most complete evidence before it.' " ' "[13] We cannot conclude that the superior court's calculation was the best, or even a reasonable, indicator of Dunlap's earning capacity, and we therefore conclude that the superior court's imputation of income was clearly erroneous.

## V. CONCLUSION

We VACATE the superior court's findings and decision that Dunlap was voluntarily underemployed and REMAND for further explanation of this issue and for

---

[12] *Cf. Graham v. Graham*, No. S-9798, 2003 WL 168666, at *6 (Alaska Jan. 22, 2003) ("Holly conceded in her briefs and at oral argument that she makes at least $24 per hour. Using this rate, Holly's net income for working full-time would still approximate the figure found by the court."); *Kowalski v. Kowalski*, 806 P.2d 1368, 1372 (Alaska 1991) ("The court's finding that Richard was voluntarily unemployed gives it the discretion to select and average prior years' earnings to determine his potential income.").

[13] *Reilly*, 314 P.3d at 1217 (alterations in original) (quoting *Ward*, 167 P.3d at 55).

findings and explanation on the reasonableness or unreasonableness of the underemployment.  We  REVERSE the superior court's decision to impute income and its calculation of imputed income and REMAND for further proceedings consistent with this opinion.