*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@appellate.courts.state.ak.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| JOLENE SHARPE n/k/a LYON, | ) | |
| | ) | Supreme Court No. S-15262 |
| Appellant, | ) | |
| | ) | Superior Court No. 3AN-11-10036 CI |
| v. | ) | |
| | ) | O P I N I O N |
| JYZYK SHARPE, | ) | |
| | ) | No. 7074 – January 8, 2016 |
| Appellee. | ) | |
| _____ | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Andrew Guidi, Judge.

Appearances: Darryl L. Thompson, Darryl L. Thompson, P.C., Anchorage, for Appellant. No appearance by Appellee.

Before: Fabe, Chief Justice, Winfree, Stowers, Maassen, and Bolger, Justices.

BOLGER, Justice.
WINFREE, Justice, dissenting.
STOWERS, Justice, dissenting.

I.    INTRODUCTION

A non-custodial parent moved to modify a child support order after she quit her job in Anchorage, moved to a remote village, and adopted a subsistence lifestyle. Although the parent acknowledged that she was voluntarily unemployed, she argued that

her decision was reasonable in light of her cultural, spiritual, and religious needs. The superior court disagreed and denied the motion.

The parent appeals, arguing that the superior court gave inadequate weight to her cultural and religious needs and that the child support order violates her right to the free exercise of her religion. But the superior court adequately considered all relevant factors in deciding not to modify the child support order. And there was no plain error in the court's failure to anticipate the free exercise claim, which the parent raises for the first time on appeal. Therefore, we affirm the judgment of the superior court.

## II. FACTS AND PROCEEDINGS

Jolene Lyon[1] and Jyzyk Sharpe divorced in July 2012. The superior court awarded Jyzyk primary physical custody of the parties' only child and ordered Jolene to pay Jyzyk $1,507.00 per month in child support.

Jolene is a Yup'ik Eskimo who was raised in Nome and has family ties to the native village of Stebbins. When the child support order was issued, Jolene was "living in Anchorage, working at Alyeska Pipeline Service Company, and earning approximately [$]120,000 a year." In April 2013, she left Anchorage and took up a subsistence lifestyle in Stebbins.

Soon after relocating to Stebbins, Jolene moved to modify the child support order. She alleged that she was "no longer employed," that she was "a full time stay at home mother,"[2] and that her only income was her annual Permanent Fund Dividend.

---

[1]        Jolene was known as Jolene Sharpe until the parties divorced. To avoid confusion, we refer to both parties by their first names.

[2]        Although Jolene did not have primary custody of the parties' daughter when she moved to modify the child support order, Jolene was caring for another child from a
(continued...)

These developments, she argued, constituted a material change in circumstances warranting a modification of the child support order. She requested that the court reduce her monthly child support payment to $50 per month, the minimum allowed under Alaska Civil Rule 90.3(c)(3).

Jyzyk opposed the motion, arguing that modification of the child support order was not warranted because Jolene was "voluntarily and unreasonabl[y] unemployed." Although he acknowledged that Jolene was entitled to quit her job and move to a remote community, he argued that the parties' "ten year old daughter . . . should not be required to fund [Jolene's] lifestyle choice."

The superior court held a motion hearing in July 2013. During the hearing, Jolene testified about her life in Stebbins and the benefits she derived from her subsistence lifestyle. She expressed her desire to expose the parties' child to traditional life in Stebbins. And she said that living in Stebbins, a dry community, provided reprieve from an alcohol abuse issue she had experienced during her marriage.

Jyzyk also testified at the hearing. He expressed his belief that the parties' child would benefit from receiving child support from Jolene at its existing amount and noted that these monthly payments "helped with everything [including] rent, groceries, [and] clothes." Jyzyk testified that "[i]n a dream world [he] would bring [the parties' child] to Kotzebue [in the area where he was raised] and raise her on the river," but he recognized that financial constraints prevented him from prudently fulfilling this dream.

After the hearing the superior court denied Jolene's motion. Although the court acknowledged that "[Jolene] is finding sort of a spiritual awakening or reconnecting with Native dance, Native culture, [and] subsistence lifestyle" and that life

---

(...continued)
separate relationship.

in Stebbins is "rehabilitative for her," it concluded: "[G]iven [Jolene's] background and her previous earnings I do not agree that . . . she does not have any income capacity simply because she chose to relocate to the village of Stebbins and earn nothing . . . ." Jolene appeals.[3]

## III.    STANDARD OF REVIEW

"Trial courts have broad discretion in deciding whether to modify child support orders."[4]  "We review an award of child support, including a modification to such an award, for abuse of discretion . . . ."[5]  "A superior court abuses its discretion by making a decision that is arbitrary, capricious, manifestly unreasonable, or . . . stem[s] from an improper motive."[6]  "We use the clearly erroneous standard when reviewing factual findings, including findings regarding a party's income, imputation of income, and voluntary underemployment."[7]  Factual findings "are clearly erroneous when, 'after reviewing the record as a whole, [we are] left with a definite and firm conviction that a

---

[3]    Jyzyk did not participate in this appeal.

[4]    *Olmstead v. Ziegler*, 42 P.3d 1102, 1104 (Alaska 2002) (citing *Patch v. Patch*, 760 P.2d 526, 529 (Alaska 1988)).

[5]    *Swaney v. Granger*, 297 P.3d 132, 136 (Alaska 2013).

[6]    *Morris v. Horn*, 219 P.3d 198, 203-04 (Alaska 2009) (alterations in original) (quoting *Collins v. Arctic Builders*, 957 P.2d 980, 981 (Alaska 1998) (internal quotation marks omitted)).

[7]    *Wilhour v. Wilhour*, 308 P.3d 884, 887 (Alaska 2013) (footnotes omitted).

mistake has been made.' "[8] We review the superior court's interpretation of the civil rules[9] and the Alaska Constitution[10] de novo.

## IV. DISCUSSION

### A. The Superior Court Properly Considered The Financial Impact Of Jolene's Decision To Move To Stebbins And Adopt A Subsistence Lifestyle On Her Child.

Jolene argues that it was an abuse of discretion to deny her motion to modify the child support order. In particular, she argues that it was unreasonable for the superior court "to direct nearly total focus on [her] past income history and ignore other important factors," including the burden of the child support obligation on her free exercise of religion and the ameliorative effect of a subsistence lifestyle on her struggle with alcohol.

When one parent takes primary physical custody of a child after divorce, the non-custodial parent is required to pay child support "equal to the adjusted annual income of the non-custodial parent multiplied by" a specified percentage.[11] Although the "adjusted annual income" is typically calculated using the parent's actual income,[12] under Alaska Civil Rule 90.3(a)(4) "[t]he court may calculate child support based on a determination of the potential income of a parent who voluntarily and unreasonably is unemployed or underemployed." "Potential income will be based upon the parent's

---

[8]     *Bennett v. Bennett*, 6 P.3d 724, 726 (Alaska 2000) (quoting *Marine v. Marine*, 957 P.2d 314, 316 (Alaska 1998)).

[9]     *Wolff v. Cunningham*, 187 P.3d 479, 482 (Alaska 2008).

[10]     *Glover v. State, Dep't of Transp.*, 175 P.3d 1240, 1245 (Alaska 2008).

[11]     Alaska R. Civ. P. 90.3(a). The percentage varies according to the number of children the parties have. Alaska R. Civ. P. 90.3(a)(2).

[12]     *See* Alaska R. Civ. P. 90.3(a)(1).

work history, qualifications, and job opportunities."[13] As we have noted, the aim of Alaska Civil Rule 90.3(a)(4) "is to give courts *broad discretion* to impute income based on realistic estimates of earning potential in cases of voluntary and *unreasonable* unemployment or underemployment."[14]

Jolene conceded that she was voluntarily unemployed. Therefore, the only issue at the hearing was whether her decision to be unemployed was unreasonable. The superior court concluded that it was.

In determining whether a parent is "unreasonably" unemployed, the superior court must look to the totality of the circumstances, including "such factors as whether the obligor's reduced income is temporary, whether the change is the result of economic factors or of purely personal choices, the children's needs, and the parents' needs and financial abilities."[15] But "[b]ecause of the significance of a parent's duty to meet his or her child support obligations, we prioritize fulfillment of that duty over even legitimate decisions to be voluntarily unemployed or underemployed."[16] And we have consistently recognized that, when a child support obligor makes a career change for

---

[13] Alaska R. Civ. P. 90.3(a)(4).

[14] *Beaudoin v. Beaudoin*, 24 P.3d 523, 530 (Alaska 2001) (first emphasis added).

[15] *Sawicki v. Haxby*, 186 P.3d 546, 550 (Alaska 2008) (citations omitted) (internal quotation marks omitted).

[16] *Kestner v. Clark*, 182 P.3d 1117, 1123 (Alaska 2008) (internal quotation marks omitted); *see also id.* ("[A] parent should not be relieved of the obligation to support his or her children except under the most extreme circumstances.").

personal reasons, the superior court should consider the financial impact of this decision on the child.[17]

In *Pattee v. Pattee*, our first case considering imputed income, the non-custodial parent quit his job at a bar in Anchorage and moved to Washington to enroll in Tacoma Community College.[18] We rejected the notion that a voluntary career change should require an automatic reduction in child support:

> On the one hand, we do not believe that an obligor-parent should be "locked in" to a particular job or field during the minority of his or her children when accepting a lower-paying position may ultimately result in personal or professional advancement. On the other hand, the children of the marriage and the custodial parent should not be forced to finance the noncustodial parent's career change. We believe that the better rule is that stated by the Montana Supreme Court: "[T]he judge [is] to consider the nature of the changes and the reasons for the changes, and then to determine whether, under all the circumstances, a modification is warranted."[19]

---

**17**      *See, e.g.*, *Richardson v. Kohlin*, 175 P.3d 43, 48-49 (Alaska 2008) ("When a parent is seeking a modification of support due to a change in employment the court should consider 'the extent to which the children will ultimately benefit from the change.' " (quoting Alaska R. Civ. P. 90.3 cmt. III.C)); *Dunn v. Dunn*, 952 P.2d 268, 270 (Alaska 1998) ("When determining the potential income of the obligor parent, the trial court must also balance *the needs of the dependent children* against the needs of the obligor for a career change." (Emphasis added.)).

**18**      744 P.2d 658, 659 (Alaska 1987), *overruled on other grounds by Nass v. Seaton*, 904 P.2d 412 (Alaska 1995).

**19**      *Id*. at 662 (alterations in original) (citations omitted).

We remanded the case to allow the trial court to examine the reasons for the father's unemployment and establish an appropriate child support obligation.[20]

The foregoing quote recognizes that a child support obligor should not be "locked in" to a particular career. But this language is in a sentence that implies that a career change must be supported by a "lower-paying position" that will "ultimately result in personal or professional advancement." And this sentiment is immediately followed by the observation that "the children . . . and the custodial parent should not be forced to finance the noncustodial parent's career change." Thus the financial impact of a career change on the obligor's children has always been regarded as an important factor when a trial court examines whether voluntary unemployment is reasonable.

A few years after the *Pattee* decision, we applied the same rationale to a case where the child support obligor had moved from Alaska to El Paso, Texas to study engineering.[21] The obligor testified that he decided to change careers because he was " 'burned out' on fishing [his prior career] and wanted a safer, less strenuous career."[22] The trial court commended the obligor's pursuit of further education but noted that his plan to enroll as a part-time student and to work as a part-time welder "is not completely realistic" because he could pursue his education while working as part-time fisherman to fulfill his child support obligation.[23] The trial court imputed income to the obligor

---

[20] *Id.*

[21] *Pugil v. Cogar*, 811 P.2d 1062, 1064 (Alaska 1991).

[22] *Id.*

[23] *Id.* at 1064-66.

based on his previous employment in Alaska as a welder and commercial fisherman rather than on his prospective earnings as a welder in El Paso, and we affirmed.[24]

Similarly, in *Olmstead v. Ziegler* we considered the case of a child support obligor who left the practice of law and returned to school to become a teacher.[25] The superior court concluded that it was unreasonable for the obligor "to train for a position that is *less* remunerative than that his current education and experience justifies."[26] Though it expressed "[n]o moral criticism of [the obligor's] lifestyle change," the superior court was unwilling to "shift any of the consequent burden [of the career change] to the narrow shoulders of [the] child."[27] We affirmed, noting that the obligor had failed to demonstrate that his career change would benefit his child.[28]

In recent cases, we have repeatedly stated that the "relevant inquiry" when imputing income is "whether a parent's current situation and earnings reflect a voluntary and unreasonable decision to earn less than the parent is capable of earning."[29] And the commentary to Alaska Civil Rule 90.3 specifically requires the superior court to examine the financial impact on the child in deciding whether to impute income: "When a parent makes a career change, [the totality of the circumstances] consideration should include

---

[24]     *Id*. at 1065-67.

[25]     42 P.3d 1102, 1103-04 (Alaska 2002).

[26]     *Id*. at 1105.

[27]     *Id*.

[28]     *Id*. at 1105-06.

[29]     *Reilly v. Northrop*, 314 P.3d 1206, 1213 (Alaska 2013) (quoting *Nunley v. State, Dep't of Rev., Child Support Enforcement Div*., 99 P.3d 7, 11 (Alaska 2004)); *see also Mallory D. v. Malcolm D*., 309 P.3d 845, 849 (Alaska 2013); *Ward v. Urling*, 167 P.3d 48, 55 (Alaska 2007); *Beaudoin*, 24 P.3d at 528.

*the extent to which the children will ultimately benefit* from the change."[30]  This directive implies that a court may consider the financial impact of a career change on a child, because the amount of child support inevitably affects the child's well-being.

There are certainly cases where we have affirmed child support modifications when a career change was partly motivated by personal factors.[31]  But these cases simply illustrate that the superior court has a wide range of discretion when addressing this issue.  The fact that some cases have treated relocation decisions as reasonable does not free the superior court from the obligation to consider the financial impact of a career change on the obligor's child.  Jolene does not cite any cases where we have held that the consideration of this impact was an abuse of discretion.

In this case, Jolene moved to Stebbins and adopted a subsistence lifestyle without any intention of seeking employment to meet her child support obligation.  In support of her request for reduction of her child support obligation, she specifically stated that she had "no intention to return to the work force."  The record thus supports the superior court's conclusion that Jolene's decision to leave her employment and move to Stebbins would have an unreasonable financial impact on the resources available to care for her daughter.

The dissent argues that when a court imputes income after an obligor relocates, the reasonableness of the obligor's decision to relocate must be analyzed prior

---

[30]     Alaska R. Civ. P. 90.3 cmt. III.C (emphasis added).

[31]     *See Wilhour v. Wilhour*, 308 P.3d 884, 889 (Alaska 2013) ("[T]he fact that a parent voluntarily leaves a better-paying job in order to be closer to a child and share the child's custody should rarely weigh *against* that parent in determining whether a reduction in child support is warranted."); *Richardson v. Kohlin*, 175 P.3d 43, 49 (Alaska 2008) (noting that the obligor's desire to be closer to his family was a legitimate reason for a move that caused the obligor to become underemployed).

to and separately from the reasonableness of the obligor's unemployment. It contends that once the decision to relocate is found reasonable, imputed income must be based on the obligor's new place of residence rather than former residence. The dissent concludes that the trial court should have found Jolene's decision to move to Stebbins reasonable and erred in imputing Jolene's income based on her former job in Anchorage rather than her employment opportunities in Stebbins.

As the dissent recognizes, neither Rule 90.3(a)(4) nor Child Support Services Division regulations say anything "about considering the reasonableness of a parent's decision to relocate" prior to and separately from the reasonableness of the obligor's unemployment.[32] And the cases upon which the dissent relies also do not provide support for this contention. Rather these cases demonstrate that the obligor's reason for moving is simply one of the several factors courts may consider in deciding whether an obligor is unreasonably unemployed.[33]

In *Richardson v. Kohlin*, contrary to the dissent's claim, we did not separately analyze the reasonableness of the obligor's move from the reasonableness of his underemployment.[34] Rather we affirmed the superior court's consideration of the move's purpose as part of its totality of the circumstances analysis.[35] Moreover, unlike the present case, the obligor in *Richardson* actively sought employment in the Pacific

---

[32]    Dissent at 24.

[33]    *See* Alaska R. Civ. P. 90.3 cmt. III.C (directing courts to consider "the totality of the circumstances" in deciding whether to impute income).

[34]    175 P.3d at 43.

[35]    *See id*. at 48 ("The superior court found that [the obligor's] underemployment was reasonable *in light of* the legitimate reasons for his move and his diligent job search efforts." (Emphasis added.)).

Northwest after he was laid off from his job in Anchorage, a fact we found particularly salient.[36]

In declining to impute income based on the obligor's income in Alaska, we repeatedly emphasized the obligor's "diligen[t]" and "extensive attempts to find high-paying work in [his new location]."[37] We lauded the trial court for giving "great weight to [the obligor's] efforts to find work, the fact that he was [currently] working full time, and his active pursuit of higher paying work," and we noted that these efforts distinguished the case from cases in which we have upheld the imputation of income.[38] No such diligent efforts to find work are present in the case now before us. In contrast, as Jolene testified, she has not applied for any jobs in Stebbins and "ha[s] no intention to return to the workforce."

The dissent also relies on *Petrilla v. Petrilla*, but that case did not involve a review of the superior court's decision to impute income.[39] In *Petrilla*, after the obligor moved from Alaska to Nevada and failed to find work, the superior court issued a modified child support order imputing income to the obligor based on his potential income in Nevada.[40] Neither party timely appealed that order.[41] Rather the obligor then

---

[36]     *Id*. at 45.

[37]     *Id*. at 49.

[38]     *Id*.

[39]     *See* dissent at 26-28, 36, 41 & n.58 (citing *Petrilla v. Petrilla*, 305 P.3d 302 (Alaska 2013)).

[40]     *Petrilla*, 305 P.3d at 305.

[41]     *Id*. at 306  ("Having elected to forgo a timely appeal of the [child support order imputing income], [the obligor] cannot challenge that order now in the context of an appeal of the denial of modification." (Citation omitted.)).

found a job that paid less than the imputed income estimate and then moved to modify the post-relocation support order to reflect his actual income.[42] After the superior court denied his request, the obligor appealed.[43]

On appeal we recognized that, because the obligor did not file a timely appeal of the superior court's decision to impute income, the obligor could no longer challenge that decision.[44] Thus the sole issue before us in *Petrilla* was whether the superior court should have modified the support order to reflect the obligor's actual rather than imputed salary. *Petrilla* is not applicable to the case before us now. The issue here is whether the superior court should have modified Jolene's support order, which was issued *before* Jolene moved and based on her actual income in Anchorage, to reflect her post-relocation circumstances. Unlike *Petrilla*, here we do not consider whether the superior court should have modified an imputed support order that was issued *after* the obligor relocated.

The dissent also misunderstands our decision in *Sawicki*.[45] Similar to *Petrilla*, in *Sawicki* we considered a child support order that the superior court issued *after* the obligor relocated to Indiana to take a new job.[46] When the obligor voluntarily left her new job for a lower-paying job, she asked the court to modify the order, but the court declined to do so.[47] Thus on appeal we considered whether the obligor was entitled

---

[42]     *Id*. at 305.

[43]     *Id*. at 305, 308-09.

[44]     *Id*. at 306.

[45]     *See* dissent at 40 (citing *Sawicki v. Haxby*, 186 P.3d 546 (Alaska 2008)).

[46]     *See Sawicki*, 186 P.3d at 547.

[47]     *Id*.

to a reduction in child support based on her voluntary change in employment.[48] The reasonableness of her move from Alaska to Indiana was not at issue because the challenged child support order postdated that move.

The dissent also draws support from our *Moeller-Prokosch* line of cases for its contention that the reasonableness of an obligor's decision to relocate must be considered separately from and prior to the reasonableness of unemployment.[49] Yet the *Moeller-Prokosch* cases do not lend such support because they consider *child custody* in light of a custodial parent's decision to relocate, not *child support* obligations when a non-custodial parent decides to relocate. These two issues — child custody and child support — have distinct considerations and courts accordingly analyze them differently.

In making custody determinations courts must apply the best interests of the child analysis.[50] When a custodial parent seeks to relocate with the child, the court must analyze the reasonableness of the relocation decision to ascertain whether the move has illegitimate motives, such as a desire to prevent contact between the child and the non-custodial parent.[51] If the court finds such illegitimate motives, it must consider them

---

[48] *See id.*

[49] *See* dissent at 24 n.9 (citing *Moeller-Prokosch v. Prokosch (Moeller I)*, 27 P.3d 314 (Alaska 2001), and *Moeller-Prokosch v. Prokosch* (*Moeller II*), 53 P.3d 152 (Alaska 2002)).

[50] AS 25.24.150(c).

[51] *See Moeller I*, 27 P.3d at 316.

in its best interests of the child analysis.[52]  If not, the court cannot hold the parent's decision to relocate against the parent when determining custody.[53]

In contrast, when calculating child support courts do not conduct a best interests of the child analysis.  Rather the non-custodial parent's child support obligation is based on a statutorily prescribed percentage of their actual or imputed annual income, as mandated by court rule.[54]  Thus while the *Moeller-Prokosch* cases do require courts to consider whether a parent's decision to relocate is reasonable in custody cases, this requirement is inapplicable to child support determinations.

The dissent also argues that imputing income based on a non-custodial parent's job in a prior place of residence produces an asymmetry with the custodial parent's "absolute right to change careers, take a lower-paying job, . . . quit work altogether[, or] perhaps even . . . move to another geographic location with the children."[55]  But this "absolute right" of the custodial parent exists only in theory, as demonstrated by Jyzyk's testimony that "in a dream world" he would move back to his Native village with his daughter but "finances" prevented him from doing so.  Contrary to the dissent's claim, custodial parents do not possess any such "absolute freedom" — their child's needs constrain their actions.[56]  Further, Jolene's decision to exercise her

---

[52]    *See id*.

[53]    *See Moeller II*, 53 P.3d at 155.

[54]    Alaska R. Civ. P. 90.3.

[55]    Dissent at 42.

[56]    *See Rego v. Rego*, 259 P.3d 447, 451-52, 455-57 (Alaska 2011) (upholding a decision, based on the best interests of the child analysis, that forced a custodial father to choose between remaining in Alaska and retaining custody of his child or relocating to New Jersey, as planned, and losing custody).  Contrary to the dissent's interpretation,
(continued...)

freedom to move restricts Jyzyk's freedom to do the same. While the dissent argues that our decision "effectively order[s] where a non-custodial parent must live and what specific job that parent must hold,"[57] it fails to recognize that its preferred outcome would have the same limiting effect on the custodial parent, and consequently the child.

B. **The Superior Court Adequately Considered Jolene's Religious And Cultural Needs.**

Jolene argues that the superior court "direct[ed] nearly total focus on [her] past income history" and gave short shrift to Jolene's religious and cultural needs. It is true that "the parents' needs" is one of the factors the superior court must consider in evaluating the totality of the circumstances.[58] But the superior court did adequately consider Jolene's needs, and after considering these needs it found that they did not outweigh other concerns, including her daughter's need for financial support:

> [Jolene] finds that [living in Stebbins] is sort of rehabilitative for her from the standpoint of her eliminating . . . some of the poisons of urban life. . . . She is finding sort of a spiritual reawakening or reconnecting with Native dance, Native culture, subsistence lifestyle, all of which is . . . admirable in an abstract sense.

---

(...continued)
we *do* seriously consider the right to relocate — in the context of the applicable framework. *See id*. at 456 ("A parent's decision to relocate . . . changes the best interests calculus."); dissent at 24 & n.9, 42 & n.63. But, as we explained in *Rego*, "[t]he chance that the superior court's decision will influence [a custodial parent's] decision to move does not justify reversing the superior court's order." 259 P.3d at 456. Custody and child support orders may force parents, custodial and non-custodial alike, to make difficult decisions.

[57] Dissent at 42.

[58] *Sawicki v. Haxby*, 186 P.3d 546, 550 (Alaska 2008).

Then again . . . she effectively is . . . taking a vacation from the financial responsibilities that she assumed when she had a child, and the result of her not working and providing financial assistance is that it's going to impose . . . a greater burden on [Jyzyk], but, more importantly, it's going to have an impact over time on the opportunities . . . and resources that are available to take care of [the parties' daughter].

Now, I don't know whether it's realistic to continue child support at [$]120,000 a year, . . . but given her background and her previous earnings I do not agree that it should be that she does not have any income capacity simply because she chose to relocate to the village of Stebbins and earn nothing . . . .

. . . .

. . . I do find it a difficult choice in this case because [Jolene] does seem to derive some very valid benefits from being in Stebbins, and I'm sure that for the summers [her daughter] derives some benefits there, too, but then there's the other nine months of the year when [the parties' daughter] lives in Anchorage and she'd be getting $50 a month, if that, instead of . . . $1500 a month, which could go a long way toward providing for necessities and also toward . . . providing for her future needs, educational needs, and to help give her a good start in life.

The record thus reflects that the superior court adequately considered Jolene's personal needs when it determined that her voluntary unemployment was unreasonable.[59]

---

[59] Jolene also argues that, "because this case involves a choice made on cultural and religious grounds — a choice protected by the free exercise clause of the Alaska Constitution, . . . a higher standard should be required to show that her decision was unreasonable under the circumstances." But she does not cite any cases to support the proposition that a totality of the circumstances test should give special weight to religious concerns. Jolene's religious rights are more appropriately addressed through a

(continued...)

Despite this consideration, the dissent worries that the superior court "trivialize[s] Alaska Natives' way of life"[60] and "devalues Alaska Natives' cultural, spiritual, and religious connections to their villages and their subsistence lifestyle."[61] Yet in reality the dissent's desired outcome would have enormous financial implications for Alaska Native children. "The primary purpose of Rule 90.3 is to ensure that child support orders are adequate to meet the needs of children, subject to the ability of parents to pay."[62] Granting either parent absolute freedom to exit the workforce would undermine this purpose.

### C. There Was No Plain Error In The Superior Court's Failure To Address Jolene's Free Exercise Claim Sua Sponte.

Jolene argues that the child support order burdens her right to the free exercise of her religion under the Alaska Constitution because it effectively requires her to abandon her Native religious and cultural heritage and maintain a stressful job in Anchorage. She argues that the superior court abused its discretion by failing to address this undue burden on her religious practice.

The Alaska Constitution provides that "[n]o law shall be made respecting an establishment of religion, or prohibiting the free exercise thereof."[63] A person's conduct is protected by the Free Exercise Clause if (1) "a religion is involved, the conduct in question is religiously based, and the [person] is sincere in his or her religious

---

(...continued)
separate free exercise claim, which we consider next.

[60] Dissent at 33.

[61] Dissent at 44.

[62] Alaska R. Civ. P. 90.3 cmt.I.B.

[63] Alaska Const. art. I, § 4.

belief"; and (2) "the conduct poses . . . [no] substantial threat to public safety, peace or order," and "there are [no] competing governmental interests that are of the highest order and are not otherwise served."[64]

Jolene never argued before the superior court that the child support order should be modified because the existing order infringes her freedom of religion. Her motion to modify child support did not mention the Alaska Constitution's Free Exercise Clause. And although she testified at the hearing about her spiritual and cultural connections to life in Stebbins and the religious character of Eskimo dancing, she never invoked the Alaska Constitution or otherwise argued that the child support order burdened her Native religious practices. Therefore, Jolene's free exercise claim was never considered by the superior court, and we review it for plain error only.[65]

Although Jolene presented ample testimony at the hearing about her subsistence lifestyle and the benefits she obtains from living in Stebbins, her testimony did not focus on whether her decision to move to Stebbins was motivated by religious belief, whether her alleged religious beliefs were sincere,[66] or whether her religious exercise would have been burdened had she remained in Anchorage and continued to

---

[64] *Larson v. Cooper*, 90 P.3d 125, 131 (Alaska 2004) (alteration omitted) (internal quotation marks omitted).

[65] *See David S. v. State, Dep't of Health & Soc. Servs.*, 270 P.3d 767, 774 (Alaska 2012). Plain error "exists where an obvious mistake has been made which creates a high likelihood that injustice has resulted." *Id.* (quoting *D.J. v. P.C.*, 36 P.3d 663, 668 (Alaska 2001)) (internal quotation marks omitted).

[66] Jolene represents that the superior court said it "had no reason to question her sincerity." But the court merely noted: "I don't question . . . your sincerity and . . . the value you place in reconnecting with [your] . . . Native and historical . . . cultural . . . roots . . . ." The court expressed no opinion about Jolene's *religious beliefs*.

work for Alyeska[67] or sought employment in Stebbins. Without being presented with evidence and argument about these key questions, the superior court did not make an obvious mistake in failing to address the free exercise issue sua sponte. And even if the court had anticipated Jolene's free exercise claim, it could not have evaluated the merits of the claim using only the evidence elicited at the hearing. We conclude that there was no plain error in the superior court's failure to address Jolene's free exercise claim.

## V.     CONCLUSION

The judgment of the superior court is AFFIRMED.

---

[67]     For example, Jolene testified that when she lived in Anchorage, although she was "weather-bound" there for "a couple years," she would travel to Stebbins "every February/March to come to the potlatch," and that she "came [to Stebbins] every opportunity [she and members of her family] knew that there was going to be Eskimo dancing."

STOWERS, Justice, dissenting.

I join in that part of Justice Winfree's dissent that would remand to the superior court to reconsider the issues of (1) the legitimacy of the mother's move and (2) the voluntary unemployment analysis, which should instead focus on her employment opportunities in Stebbins. However, I disagree to the extent the dissent suggests that the mother may have a valid Free Exercise of religion claim. The mother's claim that she wishes to move to a place because that place enhances her cultural and spiritual experience is, in my judgment, fairly conclusory and insufficient to state a Free Exercise claim. I particularly find this to be the case because the mother failed to mention, much less argue the applicability of, the Free Exercise clause before the trial court. Were the case to be remanded for further proceedings, the mother of course could make a Free Exercise claim and seek to admit evidence in support of it.

WINFREE, Justice, dissenting.

I respectfully disagree with today's decision affirming the superior court's denial of Jolene Lyon's motion to modify her child support obligation. In my view: (1) it was clearly erroneous to find Jolene's move to Stebbins unreasonable; (2) it was legal error to conflate the reasonableness of Jolene's relocation to Stebbins with the reasonableness of her unemployment in Stebbins; (3) there was an insufficient factual basis to support a finding that Jolene was unreasonably unemployed in Stebbins; (4) it was an abuse of discretion not to consider all the required factors when determining whether Jolene is unreasonably unemployed; and (5) it was clearly erroneous to determine that Jolene could reasonably continue to earn $120,000 annually, whether in Anchorage or in Stebbins.[1] The reasons behind Jolene's move to Stebbins are far more compelling — certainly not less compelling — than parental moves found reasonable in

---

[1]    I believe the standards of review applicable to this case are as follows: Whether a substantial change of circumstances has occurred to allow consideration of child support modification is a question of law. *See Bagby v. Bagby*, 250 P.3d 1127, 1128 (Alaska 2011); *see also* Alaska R. Civ. P. 90.3(h)(1) (allowing modification of child support "upon a showing of a material change of circumstances" and setting presumption of a material change of circumstances if new financial situation would lead to more than a 15% change in support). Whether a parent's relocation is for a legitimate reason is a question of fact reviewed for clear error. *Cf. Richardson v. Kohlin*, 175 P.3d 43, 49-50 (Alaska 2008) (affirming factual finding that father's move was for legitimate purpose). Whether a parent is voluntarily and unreasonably unemployed are questions of fact reviewed for clear error. *See Reilly v. Northrop*, 314 P.3d 1206, 1212, 1216 (Alaska 2013) ("The factual findings . . . that [the father] was voluntarily and unreasonably underemployed are supported by the record and are not clearly erroneous."). Courts have broad discretion in deciding whether to modify child support and whether to impute income, *see id.* at 1212, but "[s]ufficient factual findings are required for imputing . . . or declining to impute income." *Richardson*, 175 P.3d at 48. The calculation of imputed income is a question of fact reviewed for clear error. *Reilly*, 314 P.3d at 1212 & n.7.

prior cases, and in those prior cases the parent's imputed income, if any, was determined by employment opportunities in the new location, not the old location. Accordingly the superior court should have focused on Jolene's employment opportunities in Stebbins. I would remand for further proceedings to determine whether Jolene is unreasonably unemployed based on her overall circumstances in Stebbins, taking into account Jolene's Free Exercise argument.

Alaska Civil Rule 90.3(a)(4) permits a court to impute income when a parent "voluntarily and unreasonably is unemployed or underemployed." In deciding whether a parent is unreasonably unemployed, the court must evaluate all of the parent's circumstances.[2] If the court decides to impute income to a parent, the rule requires the court to consider "the parent's work history, qualifications, and job opportunities," as well as potential income from existing assets.[3] Child Support Services Division (CSSD) regulations about voluntary and unreasonable unemployment echo Rule 90.3(a)(4),[4] but more specifically require CSSD to consider "the parent's . . . job opportunities *in the area where the parent physically resides*" when determining imputed income.[5] The regulations also provide that "if a parent makes a career change, the agency will consider

---

[2] *See Sawicki v. Haxby*, 186 P.3d 546, 550 (Alaska 2008) (citing Alaska R. Civ. P. 90.3 cmt. III.C).

[3] Alaska R. Civ. P. 90.3(a)(4); *O'Connell v. Christenson*, 75 P.3d 1037, 1041 (Alaska 2003). *See also Horne v. Touhakis*, 356 P.3d 280, 284 (Alaska 2015) (noting lack of specific findings to support income imputation order and directing superior court to make findings on "the four factors enumerated in Rule 90.3(a)(4))"); *Gonzalez v. Bernal*, No. S-12784, 2009 WL 1039846, at *2 (Alaska Apr. 15, 2009) (reversing superior court order imputing income to parent because court did not make "a more specific inquiry into her actual present ability to earn" the amount of imputed income).

[4] 15 Alaska Administrative Code (AAC) 125.060(a) (2013).

[5] 15 AAC 125.020(b) (emphasis added).

the extent to which the children will ultimately benefit from the change."[6] Additionally CSSD permits a parent to request that an order to withhold and deliver be modified based on hardship when the obligor parent "*lives a subsistence life style without any local opportunity for employment*."[7]

Rule 90.3(a)(4) says nothing about considering the reasonableness of a parent's decision to relocate, nor do CSSD's regulations.[8] But our case law reflects that the reasonableness of a move is considered separately from the reasonableness of unemployment, and that once a relocation decision is determined legitimate — i.e., reasonable — the parent's imputed or actual income is evaluated in the context of the new location, not the old location.[9] This case law is consistent with the CSSD regulation,

---

[6]     15 AAC 125.060(c); *accord* Alaska R. Civ. P. 90.3 cmt. III.C; *see also Richardson*, 175 P.3d at 49 (discussing superior court's findings regarding parent's move outside of Alaska and potential benefits for child despite 40% decrease in child support).

[7]     15 AAC 125.550(a), (b)(5) (emphasis added).

[8]     *See* Alaska R. Civ. P. 90.3(a)(4); 15 AAC 125.010-.900 (2015).

[9]     *See Petrilla v. Petrilla*, 305 P.3d 302, 307-08 (Alaska 2013) (focusing upon availability of employment for father in new location when determining whether income could be imputed to him); *Richardson*, 175 P.3d at 49-50 (affirming child support modification order based on lower income in new location). In the analogous context of child custody modification due to a parent's relocation, we have directed courts to conduct a similar analysis: If a parent's intent to relocate is not legitimate — i.e., the parent is primarily motivated by a desire to make visitation more difficult — then that illegitimate intent and motivation may be held against the relocating parent when determining the child's best interests. *See Moeller-Prokosch v. Prokosch*, 27 P.3d 314, 316 (Alaska 2001). But if the intended relocation is legitimate, the relocation itself cannot be held against the relocating parent. *Moeller-Prokosch v. Prokosch*, 53 P.3d 152, 155 (Alaska 2002). As we noted in *Rego v. Rego*, 259 P.3d 447, 454 (Alaska 2011), "we take seriously the alleged infringement on a custodial parent's right to relocate."

noted above, requiring consideration of imputed income in the economy "where the parent physically resides."[10]

In *Richardson v. Kohlin* we addressed child support modification when a non-custodial father relocated outside of Alaska and the mother requested imputation of income based on the father's previous Alaska income.[11] The father was an Anchorage union worker who decided to move to the Pacific Northwest to be closer to his and his new wife's families and to avoid continual custody disputes with the mother.[12] The mother argued that the father's move "was ill-considered and impulsive" and that their child would suffer from the move because of diminished support.[13] The superior court found the reasons for the father's move legitimate; found potential benefits to the child, including "the opportunity to better know her extended family" and the possibility of diminished conflict between her parents; and determined that it would be inappropriate to impute income.[14]

On appeal we affirmed the superior court's factual finding that the father's move was for a legitimate purpose.[15] We then considered whether the court "abused its discretion" in "finding" that the father's underemployment was reasonable.[16] We upheld

---

[10]  15 AAC 125.020(b).

[11]  *See* 175 P.3d at 44-45, 48-50.

[12]  *Id*. at 44, 49.

[13]  *Id*. at 49.

[14]  *Id*.

[15]  *Id*. at 48-50.

[16]  *Id.* at 49-50. This seems to be the incorrect standard of review. A

(continued...)

the court's finding that, in light of the father's efforts to find work, his full-time employment, and his active pursuit of higher-paying work, the father's "underemployment" was reasonable.[17] Although our *Richardson* opinion is not particularly clear, I understand the ultimate ruling to be that: (1) because the move was legitimate, there was no basis to impute income based on the father's prior Alaska income level, and (2) because the father was making reasonable efforts to find appropriate work in his new location, there was no basis to impute income based on income levels at the new location.

In *Petrilla v. Petrilla* parents were in a joint custody arrangement until the father decided to relocate to Nevada with his new wife and daughter to be closer to his parents, one of whom was terminally ill, in Arizona.[18] The father quit his job as a juvenile probation officer with the State of Alaska and for some time received unemployment benefits while looking for similar work in Nevada.[19] The mother moved to modify custody and support before the father's move, and after the move requested that the court impute income to him based on his Alaska income.[20] The father agreed the mother should have sole legal and primary physical custody of their child, but disagreed

---

[16](...continued)
determination that underemployment is reasonable is a factual finding, and our use of the term "finding" should have directed us to the proper "clearly erroneous" standard of review. *See, e.g.*, *Reilly v. Northrop*, 314 P.3d 1206, 1216 (Alaska 2013) ("[T]he factual findings made by the superior court that [the father] was voluntarily and unreasonably underemployed are supported by the record and are not clearly erroneous.").

[17]    *Richardson*, 175 P.3d at 49-50.

[18]    305 P.3d 302, 303 (Alaska 2013).

[19]    *Id*. at 303-05.

[20]    *Id*. at 303-04.

with the mother's contention that his child support payment should be based on his former Alaska income.[21] The superior court rejected the mother's argument that the father's support obligation should be based solely on his prior Alaska income — appearing to state that it could not find the move itself to be voluntary underemployment — and based the obligation on his Alaska income during the time he actually worked for the State, then on his unemployment benefit income for five months, and thereafter on what he could reasonably earn if he obtained a juvenile probation officer position with the State of Nevada.[22] The father then filed a new motion to modify the court's final calculation of his child support obligation, asserting that he had obtained a job with the State of Nevada as a family services specialist and that his income would be around $33,000 rather than the nearly $44,500 figure the court had imputed to him as a Nevada juvenile probation officer.[23] The court denied the motion.[24]

On appeal we concluded that the superior court had not provided a sufficient factual basis to support its denial of the father's modification motion,[25] specifically noting that the court "made no express finding that [the father] was capable of earning more than his new job paid, that higher-paying jobs were available to [the father] in Nevada, or that [the father] took a position paying less than what was

---

[21] *Id.*

[22] *Id.* at 305.

[23] *Id.*

[24] *Id.*

[25] *Id.* at 306-08; *see also Richardson v. Kohlin*, 175 P.3d 43, 48 (Alaska 2008) ("Sufficient factual findings are required for imputing income or declining to impute income.").

available."[26]  We also stated:  "[T]he record before us does not reflect the availability of employment opportunities in Nevada that would have paid [the father] more than the position he secured."[27]  Rejecting the court's position that the father "may have to work one or two jobs" to meet his imputed income level, we remanded for more detailed findings.[28]

Now to the facts of this case.  Jolene is half Yup'ik Eskimo, and her tribal affiliation is with Stebbins Community Association.  Jolene's Yup'ik mother was born and raised in Stebbins, about 120 miles from Nome.  Jolene was born in Anchorage but raised in Stebbins and Nome.  Jyzyk is an Alaska Native from the Kotzebue area, although the record does not reflect a tribal affiliation.

Jolene and Jyzyk married in December 2002 in Nome.  Their daughter was born in Anchorage in June 2002.  She is an enrolled tribal member of Stebbins Community Association.

Jyzyk filed for divorce in August 2011.  In September Jolene and Jyzyk stipulated to equal shared custody, with the parties alternating custody on a weekly basis but limiting their contact to writings only.  Based primarily on her roughly $120,000 annual salary at Alyeska Pipeline Service Company, Jolene was ordered to pay Jyzyk approximately $885 monthly as interim child support.

The record is clear that Jolene and Jyzyk's post-separation relationship was contentious from the start.  Soon after their stipulated order barring non-written communication and expressly barring each from the other's residence, Jolene moved

---

[26]     *Petrilla*, 305 P.3d at 307 (footnotes omitted).

[27]     *Id.* at 308.

[28]     *Id.* at 308 & n.21.

(unsuccessfully) to bifurcate the proceedings with the early entry of a divorce decree, stating that the post-separation period was "fairly volatile" and that she and Jyzyk could "reap psychological benefits and a calming effect" from the early decree. Both before and after the divorce trial the parties engaged in mutual motion practice for orders to show cause and sanctions.

In February 2012 the court entered a new preliminary and then a final interim custody modification order giving Jyzyk primary physical custody of their daughter, restricting Jolene to limited supervised visitation, and directing that Jolene's support obligation be modified accordingly. This change arose from an alcohol-related incident of violence at Jolene's residence while the then nine-year-old daughter was present. Jyzyk contended that Jolene began drinking heavily in early 2010; according to other documents in the record, this was a few months after Jolene began working for Alyeska. As part of the court's final interim order, Jolene and Jyzyk were each ordered to "undergo an alcohol assessment."

By the time of the July 2012 divorce trial Jolene had undergone her required alcohol assessment. Jyzyk successfully argued at trial for sole legal custody of their daughter because of conflict and inability to communicate with Jolene. Jolene was granted continued supervised visitation consistent with the final February interim order. The court ordered that when Jolene completed the recommendations associated with her alcohol assessment, the requirement that visitation be supervised would be lifted. Of final note with respect to child custody, the court recognized Jyzyk's concerns — and expressed its own — about Jolene's boyfriend, B.J., a childhood friend of hers from Stebbins with whom she reconnected in 2011. B.J. was one of the persons involved in the February alcohol-related incident, but the court ordered that B.J.'s "presence in [Jolene's] life would not preclude [Jolene's] receipt of unsupervised visitation." At the

conclusion of the divorce proceedings Jolene was ordered to pay $1,507 monthly in child support.

Also relevant to the issue before us is a small portion of the superior court's property division at the time of divorce. The court first recognized that Jolene had a non-marital interest in her mother's restricted Native allotment property in the Nome area. The court next ordered that Jolene and Jyzyk would "continue to co-own, [as] joint tenants in common, a Nome-area lot" to be held or disposed of by mutual agreement.

The superior court's decision was issued in late July. In mid-August Jolene submitted a certificate of completion for her out-patient alcohol treatment program. She sought, but Jyzyk opposed, implementation of an unsupervised visitation schedule. At an early November evidentiary hearing the court approved a visitation agreement reached by the parties, including a provision that Jolene not have unsupervised visitation with B.J. present until B.J. submitted his own certification from an alcohol treatment program. B.J.'s certificate of completion of an out-patient treatment program was filed a week later.

In February 2013 Jolene and B.J. had a son. In late April Jolene, B.J., and their son moved to Stebbins, where they lived together in a small four-plex apartment. B.J. began working in Stebbins to support the family, while Jolene stayed home with their son and immersed herself in Yup'ik cultural and religious activities and a subsistence lifestyle.

Contending that her new child and relocation to Stebbins constituted a change of circumstances warranting modification of her child support obligation, Jolene moved to reduce her child support to the minimum $50 monthly payment.[29] Jyzyk

---

[29] *See* Alaska R. Civ. P. 90.3(h)(1) (allowing modification of child support
(continued...)

opposed the motion, arguing that Jolene was voluntarily and unreasonably unemployed, that she should not have quit her Anchorage job with Alyeska, and that her child support obligation should remain unchanged. Jolene replied that she had "made a cultural, religious and spiritual decision to move to her home village of Stebbins" — a decision "she had always intended to make when the opportunity presented itself" — and that a modification of child support was warranted.

The superior court ordered a hearing, expressly recognizing the religious underpinning of Jolene's modification motion by quoting her reply memorandum statement that her decision to move to Stebbins was "cultural, religious and spiritual." The court noted that Jolene conceded her unemployment was voluntary, and that it therefore had to determine whether Jolene's unemployment was unreasonable and, if so, whether it should impute income to her when determining her child support obligation.

At the hearing Jolene testified at some length about her cultural, religious, and spiritual ties to Stebbins. As noted above, Jolene's mother is a Yup'ik Eskimo born and raised in Stebbins; Jolene is half Yup'ik Eskimo and was raised in Nome and Stebbins. Like Jolene, her daughter is an enrolled tribal member of Stebbins Community Association. B.J. also is from Stebbins, and Jolene and B.J. want their son to grow up in the village and "know[] where he comes from and who his people are." Jolene always dreamed of living in the area, and she and Jyzyk had purchased the lot in Nome with that intent. Jolene stated that her "roots" brought her back to Stebbins and that Stebbins "is the cornerstone of [her] spiritual connection, [her] cultural connection, [and her] subsistence lifestyle." Her "family history[] and [her] relatives [are] all from [Stebbins]."

---

**29**(...continued)
"upon a showing of a material change of circumstances" and setting presumption of such a change if new financial situation would lead to a variation in support of more than 15%); Alaska R. Civ. P. 90.3(c)(3) (setting general minimum monthly child support).

Jolene reconnected with these roots in 2004 when she brought her daughter there and participated in her "first traditional dance with [her] daughter, [her] mom, and [her] brother and his son" and returned in later years for the "yuraq" (Eskimo dancing) and Yup'ik Eskimo lifestyle. Jolene wanted her daughter to be brought up in Alaska Native culture and experience village life.

After relocating, Jolene became "completely immersed in the subsistence lifestyle [in Stebbins]" and participated in Eskimo dancing as much as she could. Jolene "learned that Eskimo dancing was — traditionally before Christianity came [to Stebbins] — was [the Yup'ik Eskimo] religion" and she has "found that Eskimo dancing is very, very spiritual and healing in making a connection with our [Yup'ik Eskimo] ancestors." Stebbins is a "dry" community, also one of the main reasons she left Anchorage for Stebbins. In terms of dealing with sobriety, she was "so much . . . happier" living the subsistence lifestyle in Stebbins, and she found life in Stebbins "spiritually healing." Jolene also explained that to "fully embrace" the spiritual aspects of Eskimo dancing and to participate fully in subsistence activities, it was important to live in her village.

During its own questioning of Jolene, the superior court stated: "I've heard your testimony and I don't question . . . your sincerity and . . . the value you place in reconnecting with [your] . . . Native and historical cultural . . . roots . . . ." But when it came time to determine whether Jolene's move to Stebbins was for a legitimate purpose, the court characterized her decision as only "admirable in an abstract sense," "essentially taking a retreat from reality," and "a lovely dream." The court posited the following hypothetical:

> [I]f we change the facts in this case, just hypothetically, and I had a person who – non-Indian, non-Native, but had decided that – one of the obligor parents had decided they wanted to join an ashram in India because it reawakened them spiritually and reconnected them and they wanted to go

to a mountainous retreat, live a basic normal lifestyle and do this, and essentially withdraw from providing financial support, I would have a hard time in that hypothetical situation simply approving it, and I have the same difficulty in this case.

This hypothetical and the court's other unfortunate comparisons to joining a monastery or going to a "Tibetan retreat" serve only to trivialize Alaska Natives' way of life. Contrary to the superior court's analogy, Alaska Natives' cultural, religious, and spiritual connection to their tribes, their lands, and their subsistence activities are a normal way of life, not an escape from normal life. Our legislature has recognized the spiritual nature of subsistence living,[30] and we likewise have recognized the importance of subsistence activities to Alaska Native cultural and social identity.[31] We applied the Free Exercise Clause[32] in *Frank v. State* to exempt the taking of moose for Athabaskan

---

[30]    *See* ch. 1, § 1(a)(3), SSSLA 1992 (finding that customary and traditional uses of fish and game "are culturally, socially, spiritually, and nutritionally important and provide a sense of identity for many subsistence users").

[31]    *See, e.g.*, *Hammond v. N. Slope Borough*, 645 P.2d 750, 754 (Alaska 1982) ("The significance of subsistence activities is not limited to food gathering, but involves social and cultural identification of a traditional and unique lifestyle."); *State v. Tanana Valley Sportsmen's Ass'n*, 583 P.2d 854, 859 n.18 (Alaska 1978) (discussing importance of subsistence hunting to Alaska Natives and noting that "subsistence hunting is at the core of the cultural tradition of many of these people").

[32]    Article I, section 4 of the Alaska Constitution protects an individual's right to practice a religion. It provides: "No law shall be made respecting an establishment of religion, or prohibiting the free exercise thereof." We have adopted a three-part test that Alaska Free Exercise Clause claims must pass when seeking an exemption to a facially neutral state law: "(1) a religion is involved, (2) the conduct in question is religiously based, and (3) the claimant is sincere in his/her religious belief." *Swanner v. Anchorage Equal Rights Comm'n*, 874 P.2d 274, 281 (Alaska 1994) (citing *Frank v. State*, 604 P.2d 1068, 1071 (Alaska 1979)). If these elements are established, (continued...)

funeral potlatches from State game regulations.[33]  Most recently, in *Phillip v. State* the court of appeals evaluated a Free Exercise claim related to subsistence fishing, where the fishers asserted that "according to traditional Yup'ik belief, Ellam Yua is the spirit of the universe, consisting of all things in a state of interconnectedness.  Ellam Yua provides the Yup'ik with the resources they need to survive, and the Yup'ik are expected to work hard to harvest those resources."[34]  The court of appeals ultimately decided that the State's compelling interest in ensuring a healthy Kuskokwim River king salmon run outweighed the Yup'ik subsistence fishers' religious rights.[35]

The fundamental flaw in the superior court's analysis is its conflation of the legitimacy of Jolene's move with the reasonableness of her unemployment in Stebbins and the manner in which the court imputed income to Jolene:  "[T]he choice that I'm presented with is between treating [Jolene] as having zero income or . . . having imputed to her the income that she had at Alyeska . . . ."  This was a false choice.  The questions that should have been posed and answered at the hearing were:  (1) whether Jolene's move to Stebbins was for legitimate reasons; (2) whether Jolene was in fact unreasonably unemployed in Stebbins; and if so, (3) what level of income should have been imputed

---

[32](...continued)
"religiously impelled actions can be forbidden only where they pose some substantial threat to public safety, peace or order, or where there are competing governmental interests that are of the highest order and are not otherwise served." *Frank*, 604 P.2d at 1070, 1073-74 (alterations omitted) (citation omitted) (internal quotation marks omitted); *see also Swanner*, 874 P.2d at 281.

[33]     604 P.2d at 1069-70.

[34]     347 P.3d 128, 129, 131 (Alaska App. 2015).

[35]     *See id.* at 131, 135.

to Jolene based on her work history, her qualifications, and her job opportunities *in Stebbins*.[36]

The court found that Jolene's decision to leave her employment in Anchorage and relocate to Stebbins to reconnect with her cultural roots was unreasonable because Jolene had not "established that her situation in Anchorage was destructive or adverse to her" given that there was no evidence "that she suffered from mental illness or from some sort of emotional state or psychological state that she needed to leave the urban setting, that she needed medically or psychologically or spiritually to leave Anchorage." But we never have required relocating parents to show that their prior locations were destructive to them or that they suffered from psychological conditions or mental illnesses to justify their relocation. Moreover the court's statements are at odds with its earlier custody decisions favoring Jyzyk based on Jolene's alcohol issues and with the evidence that Jolene's alcohol issues began shortly after she started working for Alyeska.[37] To the extent the court today silently approves the superior court's reliance

---

[36]     Alaska R. Civ. P. 90.3(a)(4); 15 AAC 125.020(b) (requiring CSSD to impute income based on a "parent's past income, skills, work history, and education, and the job opportunities *in the area where the parent physically resides*" (emphasis added)); *see also Reilly v. Northrop*, 314 P.3d 1206, 1210-12, 1217-18 (Alaska 2013) (affirming trial court order imputing income to obligor parent based on information from U.S. Department of Labor for region where parent had relocated); *Petrilla v. Petrilla*, 305 P.3d 302, 306-08 (Alaska 2013) (reversing because of lack of information about job opportunities where parent had relocated); *O'Connell v. Christenson*, 75 P.3d 1037, 1041 (Alaska 2003) (remanding for specific factual findings supporting amount of imputed income, suggesting that trial court refer to Alaska Department of Labor statistics).

[37]     *Cf.* AMERICAN PSYCHIATRIC ASS'N, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS, FOURTH EDITION, TEXT REVISION (DSM-IV-TR) 212 (4th ed. 2000) (listing alcohol-related disorders including alcohol dependence and abuse).

on "no destructive situation" and "no mental illness" factors to decide that a relocation is not legitimate, I strongly disagree.

In my view, even without considering Jolene's express Free Exercise claim raised on appeal, her relocation to Stebbins was legitimate — to the extent the superior court made a factual finding that Jolene's move to Stebbins was not legitimate, that finding is clearly erroneous. No evidence in the record suggests that Jolene's relocation to Stebbins was for the purpose of decreasing her child support obligation. The court told Jolene it had "heard [her] testimony and . . . [did not] question . . . [her] sincerity and . . . the value [she] place[d] in reconnecting with [her] . . . cultural . . . roots . . . ." The court also found that both Jolene and her daughter derived some benefit from Jolene's move to Stebbins, and Jyzyk agreed that Jolene benefitted to some extent from the move.

Our case law is clear that moves outside of Alaska to be near other family members and to decrease conflict over custody issues are legitimate for purposes of modifying child support.[38] How can it not be legitimate for an Alaska Native living in an urban center and having difficulty with sobriety to relocate to her own dry tribal village where she has family, cultural, religious, and spiritual roots; where she can more easily maintain sobriety; where she has property interests; where she can raise her children in their tribal culture; and where, incidentally, she can reduce conflict with her former spouse over custody and visitation issues? Our case law also is clear that children may benefit from being exposed to extended family members and decreased custodial

---

[38] *See Richardson v. Kohlin*, 175 P.3d 43, 49-50 (Alaska 2008) (affirming finding that move to be closer to other family members and decrease parental conflict over child custody was legitimate); *cf. Petrilla*, 305 P.3d at 303, 305 (affirming without questioning legitimacy of father's move to be closer to terminally ill parent).

conflict between parents.[39] How would Alaska Native children not similarly benefit from living, even part of the time, in their own tribal villages with extended family members, and from the ensuing decreased custodial conflict between parents? Under the circumstances in *Richardson* and *Petrilla* the decisions to relocate were legitimate; given Jolene's circumstances, I simply cannot fathom how her move to Stebbins is any less legitimate.

The court relegates the reasonableness of Jolene's move to one of the factors in the totality of circumstances test used to determine how much income should be imputed. But the cases actually discussed by the court provide little support for its position. In *Pattee v. Pattee* we adopted the totality of the circumstances test to determine whether child support should be reduced automatically after a voluntary reduction in income.[40] We reversed the superior court's decision setting a reduced rate

---

[39]     *Richardson*, 175 P.3d at 49-50.

[40]     744 P.2d 658, 662 (Alaska 1987), *overruled on other grounds by Nass v. Seaton*, 904 P.2d 412, 416 (Alaska 1995). The totality of the circumstances test now is set out in the commentary to Rule 90.3:

> The court may calculate child support based on a determination of the potential income of a parent who voluntarily and unreasonably is unemployed or underemployed. A determination of potential income may not be made for a parent who is physically or mentally incapacitated, or who is caring for a child under two years of age to whom the parents owe a joint legal responsibility. Potential income will be based upon the parent's work history, qualifications and job opportunities. The court shall consider the totality of the circumstances in deciding whether to impute income. When a parent makes a career change, this consideration should include the extent to which the children

(continued...)

because there was insufficient evidence about the parent's career change, and remanded for further findings.[41] Key to our decision was our determination that the parent had fraudulently conveyed an income-producing asset and was receiving rent-free housing, a monthly allowance, and tuition assistance from family members.[42] We made two statements in *Pattee* relevant here: "we do not believe that an obligor-parent should be 'locked in' to a particular job or field during the minority of [the] children when accepting a lower-paying position may ultimately result in personal or professional advancement"; and "the children of the marriage and the custodial parent should not be forced to finance the noncustodial parent's career change."[43] And we quoted a Montana case directing courts to "consider the nature of the changes and the reasons for the changes" before deciding "whether, under all the circumstances, a modification is warranted."[44]

The court says that *Pattee*'s statement about not locking a parent into a specific job or career does not apply here because "a career change *must* be supported

---

**[40]**(...continued)
> will ultimately benefit from the change. The court also may impute potential income for non-income or low income producing assets.

Alaska R. Civ. P. 90.3 cmt. III.C.

**[41]**    *Pattee*, 744 P.2d at 662. Child support initially was set at $1,200 monthly, reduced by stipulation to $700 monthly, and further reduced to $326 monthly after trial. *Id*. at 659, 662 n.7.

**[42]**    *Id*. at 659-62.

**[43]**    *Id*. at 662.

**[44]**    *Id*. (quoting *In re Marriage of Rome v. Rome*, 621 P.2d 1090, 1092 (Mont. 1981)) (internal quotation marks omitted).

by a 'lower-paying position' that will 'ultimately result in personal or professional advancement.' "[45]  But the father in *Pattee* did not have a lower-paying position; his family was supporting him (and apparently helping him defraud his former wife) and he had no stated plans after attending community college.[46]  There was considerable evidence that the father willfully was trying to minimize his property and income to avoid paying child support, suggesting illegitimacy of purpose.[47]  We nonetheless adopted a balancing test, indicating that a court must consider not just the financial impact on the family, but also the reasons for and goals of a lifestyle change.  But under the court's analysis today, there would have been no need to remand for further findings in *Pattee* — the order simply would have been reversed with instructions to reinstitute the original support obligation.

*Pugil v. Coger* involved a parent who had worked as a commercial fisher and welder but asked the court to set his child support obligation using estimated wages he could earn as a welder in Texas, where he had moved and planned to go to school.[48]  The superior court set his child support obligation based on a several-year average of his commercial fishing income.[49]  We affirmed, noting that the superior court had considered all relevant factors and that the parent "could both pursue his education and meet his

---

[45]    Opinion at 8 (emphasis added).

[46]    744 P.2d at 662.

[47]    *Id*. at 659-62.

[48]    811 P.2d 1062, 1064, 1066 (Alaska 1991).

[49]    *Id*. at 1064-65.

[support] obligation . . . by commercial fishing during one quarter of the year."[50] In short, we recognized that because of the seasonal nature of commercial fishing in Alaska, the parent could meet his support obligation without completely disrupting his life change. *Pugil* does not translate to this case: Jolene cannot change her life if her support obligation continues to be based not on her life in Stebbins, but solely on one specific full-time job in Anchorage — a job that she no longer has and that the superior court could only speculate she could regain if she returned to Anchorage.

In *Olmstead v. Ziegler* both parents were lawyers; the father later downsized his practice to become a teacher and sought a reduced support obligation (not based on teaching salaries but based solely on his reduced income as an attorney).[51] The superior court decided that the parents had equal earning capacities as lawyers and that the father failed to support his contention "that he was simply a failure at law."[52] We affirmed, adding that the father had not "prove[d] any benefit to the child from his decision to downsize his practice and change careers."[53] In contrast, it cannot be disputed that Jolene stated a cogent and legitimate rationale for her move to Stebbins and that her move and life change have benefits for her daughter.

In *Sawicki v. Haxby*[54] the superior court refused to reduce a mother's support obligation when she quit her first job after moving to Indiana and took a new job

---

[50]     *Id*. at 1066.

[51]     42 P.2d 1102, 1103-04 (Alaska 2002).

[52]     *Id*.at 1105.

[53]     *Id.* at 1106.

[54]     186 P.3d 546 (Alaska 2008).

paying half as much.[55] We affirmed, stating that the superior court had considered the mother's "work history, prior income, qualifications, education, and reasons for leaving her job" and identifying other "potentially relevant" factors — the temporary nature of her reduced income and substantial assets available to her to meet her obligation while awaiting advancement.[56] The superior court did not impute income to the mother at the maximum amount she had previously earned in Alaska, but rather determined she realistically was capable of earning the amount from her most recent job in Indiana.[57] In contrast, here the superior court did not consider the Rule 90.3(a)(4) factors for Jolene's earning capacity in Stebbins, *or even Anchorage* — it simply decided that because Jolene once earned $120,000 in Anchorage, her support obligation should be based on that salary — despite having no evidence of what she could earn in Stebbins or if she could regain the Alyeska job if she returned to Anchorage.

Absent an illegitimate motive, we have not previously, even indirectly, penalized a parent for moving from one geographical area to another.[58] Nor should we, for doing so certainly would implicate constitutional concerns.[59] And the goal of setting

---

[55]     *Id*. at 547.

[56]     *Id*. at 550-51.

[57]     *Id*. at 548, 551.

[58]     *Cf. Petrilla v. Petrilla*, 305 P.3d 302, 307-08 (Alaska 2013) (focusing on employment availability in new location when considering income imputation); *Richardson v. Kohlin*, 175 P.3d 43, 49-50 (Alaska 2008) (affirming support modification based on lower income in new location).

[59]     *Cf. Rego v. Rego*, 259 P.3d 447, 454 (Alaska 2011) (stating, in custody modification context when custodial parent intended to relocate, that "we take seriously the alleged infringement on a custodial parent's right to relocate").

support is to "arrive at an income figure reflective of economic reality,"[60] not maximum possible earnings: "Nothing in our law compels a party to earn the maximum possible wage or face imputation [of income]."[61]

Today's decision not only flies in the face of these considerations, it suggests that when setting a child support obligation neither a Native Alaskan's return to her village nor a traditional Native Alaska subsistence lifestyle has a valid role. The court's decision means that once a non-custodial Native Alaska parent participates in the cash economy of urban Alaska that parent may be unable to voluntarily return to a rural tribal community and live either a local cash-economy lifestyle, a culturally and religiously based subsistence, non-cash, lifestyle, or even something in between. And as a more general matter, why should a parent with primary physical custody have an absolute right to change careers, take a lower-paying job, or quit work altogether — perhaps even have the right to move to another geographic location with the children[62] — while a non-custodial parent with a child support obligation does not have those rights even if the actions are legitimate and provide benefits to the child? Why do we "take seriously" an alleged infringement only on a custodial parent's right to relocate, but not a non-custodial parent's right to relocate?[63] In my view a court has no right to effectively order where a non-custodial parent must live and what specific job that parent must hold.

---

[60]     *McDonald v. Trihub*, 173 P.3d 416, 427 (Alaska 2007) (quoting *Adrian v. Adrian*, 838 P.2d 808, 811 (Alaska 1992)) (internal quotation marks omitted).

[61]     *Ward v. Urling*, 167 P.3d 48, 56 (Alaska 2007) (citing *Beaudoin v. Beaudoin*, 24 P.3d 523, 530 (Alaska 2001)).

[62]     *See supra* note 9.

[63]     *Cf. Rego*, 259 P.3d at 454.

The superior court disregarded the sparse evidence it had regarding the Stebbins economy without asking for more,[64] and completely ignored the question of what Jolene could reasonably earn in Anchorage considering all of the relevant factors,[65] including that she had only a high school education and no longer worked for Alyeska. The court focused exclusively on Jolene's former employment and framed the issue as a "black and white" choice between setting support at $50 monthly or leaving child support at the high amount set in the decree based on her former Alyeska job in Anchorage. But the court acknowledged that Jolene might have to live in Anchorage to work at her former job at Alyeska, and could only speculate whether she could return to her old job even if she moved back to Anchorage. Even assuming the court could properly impute income to Jolene based on what she might reasonably earn in Anchorage, the court failed to require evidence regarding Rule 90.3(a)(4)'s imputation factors — including the fact that Jolene no longer works for Alyeska. I would remand to the superior court for further proceedings on this issue, as we did in *Horne v. Touhakis*[66] and *Petrilla*,[67] because the record does not provide a sufficient basis for

---

[64] *See Petrilla*, 305 P.3d at 307-08 & n.21 (noting lack of evidence that "higher-paying jobs were available to [the father] in Nevada" when remanding); *O'Connell v. Christensen*, 75 P.3d 1037, 1041 (Alaska 2003) (remanding for further findings because "it is not clear that employment opportunities exist in Anchorage," where the father lived, that would pay the amount of income imputed to him).

[65] *See supra* note 3 and accompanying text.

[66] 356 P.3d 280, 284 (Alaska 2015) (remanding and directing superior court to make findings based on all Rule 90.3(a)(4) factors).

[67] 305 P.3d at 308 (remanding for further findings about employment opportunities available to parent in Nevada); *see also Richardson v. Kohlin*, 175 P.3d 43, 48 (Alaska 2008) ("Sufficient factual findings are required for imputing . . . or declining

(continued...)

determining whether Jolene is employable in Stebbins (or Anchorage) and, if so, how much income should be imputed to her considering all of the required factors.[68] The court should also take into account Jolene's Free Exercise claim.[69]

Today's decision has enormous negative implications. It trivializes and devalues Alaska Natives' cultural, spiritual, and religious connections to their villages and their subsistence lifestyle.[70] It requires a non-custodial Native parent in rural Alaska to pay child support based on what the parent could earn in urban Alaska regardless of

---

[67](...continued) to impute income.").

[68]    *See O'Connell*, 75 P.3d at 1039-41; *see also Simone H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 320 P.3d 284, 287 (Alaska 2014) ("When applying a multi-factor test, '[t]he superior court abuses its discretion if it considers improper factors . . . , fails to consider statutorily mandated factors, or assigns disproportionate weight to some factors while ignoring others.' " (alterations in original) (quoting *Iverson v. Griffith*, 180 P.3d 943, 945 (Alaska 2008))); *cf. Olmstead v. Ziegler*, 42 P.3d 1102, 1106 (Alaska 2002) (observing that trial court had "ample evidence of [the parent's] work history, qualifications, and job opportunities" when imputing income).

[69]    In two cases outside of Alaska where the obligor parents belonged to religious sects that held property communally, the courts recognized that the parents' religious beliefs should be considered, even though the parents still had an obligation to support their children. *See In re Marriage of Murphy*, 574 N.W.2d 77, 79, 81-82 (Minn. App. 1998); *Hunt v. Hunt*, 648 A.2d 843, 846, 851 (Vt. 1994). Unlike parents who have argued that any imposition of a child support order would interfere with their religious beliefs, *see, e.g.*, *Hunt*, 648 A.2d at 849 (noting that obligor parent objected to payment of any support), Jolene merely asked the court to consider her religious beliefs in assessing her situation; she agreed that she had a support obligation, requesting that the court impose the minimum $50 monthly payment.

[70]    *Cf.* 15 AAC 125.550(a), (b)(5) (permitting CSSD to modify withholding order when obligor parent "lives a subsistence lifestyle without any local opportunity for employment").

the legitimacy of choosing to live in rural Alaska,[71] effectively requiring a parent in a rural area to move to an urban area to maximize income and child support. And finally, it infringes on constitutionally protected religious and privacy rights.

I dissent.

---

[71] *Cf.* 15 AAC 125.020(b) (requiring CSSD to consider job opportunities "in the area where the parent physically resides").